STATE OF NORTH DAKOTA ON THE RELATION OF O. E.
LOFTHUS, as State Bank Examiner, The Scandinavian Amer-
ican Bank of Fargo, a Corporation, and H. J. Hagen, N. G.
Eggen, Lars Christianson, H. L. Bolley, Spurgeon Odell, Emil
J. Headland, and J. P. Holmes, Directors and Stockholders of the
Scandinavian American Bank of Fargo, and P. R. Sherman,
Cashier and Stockholder, Relators, v. WILLIAM LANGER,
Attorney General, and as an Individual, and as a Member of
the State Banking Board, and Thomas Hall, Secretary of State,
and as a Member of the State Banking Board, and as an Individual,
and Albert E. Sheets, Jr., as Assistant Attorney General, and as
an Individual, and the State Banking Board and P. E. Halldor-
son, as Pretending Receiver of Said Bank, and as an Individual,
Defendants and Respondents.

(177 N. W. 408.)

**Courts — supreme court may frame its original process as the exigencies
require.**

1. In the exercise of its original jurisdiction, the supreme court may frame
its process as the exigencies require.

**Attorney general — on original application to prohibit wrongful acts of
attorney general, supreme court may act independently of his consent.**

2. Where an original application is made which seeks to restrain and pro-
hibit the further continuance of alleged wrongful acts by the attorney general,
the supreme court may exercise its original jurisdiction independent of any
application to or the consent of such attorney general.

**Prohibition — in matter involving state bank examiner, state guaranty
funds, and powers of state banks the supreme court may exercise its
original jurisdiction.**

3. Where the state examiner and a bank chartered by the state make an
original application which seeks to restrain and prohibit the attorney general
and members of the state banking board, and parties acting under their orders,
from exercising unlawful powers and usurping the powers and duties of the
state examiner in attempting to declare a state bank insolvent, and to conduct

NOTE.—On the question as to what circumstances are sufficient to put a pur-
chaser of negotiable paper on inquiry, see notes in 29 L.R.A.(N.S.) 351, and 44
L.R.A.(N.S.) 395.

On effect of certification of postdated check, see note in L.R.A.1917F, 1099.

a receivership thereover, and where it appears from the record that the prerogatives of such examiner, the state guaranty funds, and public depositors, are directly involved, and that the rights of such bank, as well as a large number of other banks, concerning their rights to do business, are concerned, and that there exists a wide-spread and unprecedented public interest and concern with regard to the solvency of such banks, and the operation of the banking laws of this state in regard thereto, it is *held* that such circumstances give rise to the exercise of the original jurisdiction of this court pursuant to its constitutional powers.

**Prohibition — the supreme court may place in charge of a state bank the state officer ordinarily charged with that duty.**

4. Upon such application, where it is deemed necessary in order to preserve the rights of the parties, to safeguard the public interests, and to prevent the issue presented in the application from becoming moot by a continuance of the alleged wrongful act, the supreme court may issue its temporary restraining order, and place in charge of the institution affected the state officer ordinarily charged with the duty in such cases.

**Statutes — latest of two conflicting statutes must prevail.**

5. It is a well-settled rule of law, where two legislative acts are repugnant to, or in conflict with each other, that the latest expression of the legislative will must control, even though it contains no repealing clause.

**Banks and banking — state examiner may take charge of bank release possession to its officers without a receiver.**

6. Pursuant to chapter 53, Laws 1915, the state examiner is granted the specific power, with the approval of the state banking board, to appoint a receiver for a banking corporation; no receiver shall be appointed for such reasonable time as he may require for an examination of a bank. Before the appointment of a receiver, he may take charge of a bank, and thereafter release the possession of such bank to its officers, without the appointment of a receiver.

**Banks and banking — state banking board cannot appoint a receiver for a bank without knowledge or consent of state bank examiner.**

7. Since the enactment of chapter 53, Laws 1915, the state banking board does not possess the power of appointing a receiver for a bank, independent of the initiative action or without the knowledge or consent of the state examiner.

**Banks and banking — state banking board, without action by state bank examiner, could not place temporary receiver in charge.**

8. Where the state banking board, during the absence of the state examiner from the state, and without his initiative action, knowledge, or consent, or that of the acting state examiner, determined a bank to be insolvent, and caused the bank to be closed, and placed its temporary receiver in charge thereof, it is *held* that such action is illegal and beyond their powers.

**Banks and banking — state banking board without action by state bank examiner may not close bank and place receiver in charge.**

9. Where the state banking board, and the attorney general acting pursuant to its orders, during the absence of the state examiner from the state, and without his initiative action, knowledge, or consent, or that of the acting state examiner, caused an examination of the Scandinavian American Bank at Fargo to be made, and immediately, upon the reception of the report of its examiners, declared such bank to be insolvent, caused the bank to be closed, and its temporary receiver to be placed in charge thereof, arbitrarily and without any warning or opportunity given to the bank officials or stockholders to comply with its demands or findings, and without notifying or consulting the state examiner or the acting state examiner, it is *held* that such action was unwarranted, and neither within the spirit nor letter of the legal powers conferred upon such board.

**Banks and banking — determination by banking board as to value of collateral held arbitrary and without foundation.**

10. Where examiners, in their report upon which the banking board determined the bank to be insolvent, list as excessive and inadequately secured loans, a number of loans aggregating $743,000 secured largely by farmers' notes and farmers' postdated checks, in the proportion of about two to one, and where such examiners have, by arbitrary action and without specification, concluded that such farmers' notes are not worth over 50 per cent of their total amounts, and that the postdated checks are not collateral at all and of no substantial value, it is *held* that such determination is wholly arbitrary and without foundation in fact.

**Banks and banking — "postdated checks" may be used as collateral.**

11. Postdated checks are negotiable instruments similar to bills of exchange payable at a future date, and may be used as collateral paper the same as any other negotiable instruments.

**Banks and banking — state banking board's finding of a bank's insolvency held unjustified and unreasonable.**

12. Where the state banking board has based its findings of insolvency upon the report and conclusions of its examiners, to the effect that certain loans in such bank are excessive and inadequately secured; that certain debts listed amounting to $46,000 are worthless; that the bank has failed to maintain its legal reserve in strict accordance with the law, and has over $169,000 of past-due paper; and where, in the record, it is shown that no opportunity was granted or order made permitting such bank to comply by reduction of such excessive loans, although it had the ability so to do, and that in fact such excessive so-termed loans were in fact adequately secured; and that, further, the banking board or the state examiner had not theretofore required the banks of the state to maintain their legal reserves as strictly required (by keeping on hand all moneys deposited by other banks with it), and had given

the bank no instructions or order so to do within a specified time; and, further, that since the state examiner took charge there was paid into such bank over $35,000 on such bad debts and a large amount upon the paper of such bank,—it is *held* that the finding of insolvency is not justified and was unreasonably so determined.

Opinion filed October 24, 1920.

Original application to prohibit and restrain the respondents from usurping the powers and duties of the state examiner, and from wrongfully continuing its appointee as receiver of the Scandinavian American Bank of Fargo.

Writ granted directing the state examiner to continue in charge of said bank, with full power to release possession of such bank to its officers when he deems fit, and restraining the respondents from further continuance of their wrongful acts.

Judgment for costs and disbursements ordered in favor of the relators and against the respondents.

*Wm. Langer,* Attorney General, *Albert E. Sheets,* Assistant Attorney General (*S. L. Nuchols* and *W. S. Lauder,* of counsel), for respondents.

*Lemke, Paddock, & Day,* for relators.

BRONSON, J. *Proceedings.*—This is an original application to prohibit and restrain the respondents from interfering with the duties of the state examiner, and from continuing their alleged wrongful acts in determining the Scandinavian American Bank of Fargo to be insolvent, and in appointing thereover, a receiver.

On October 2, 1919, this court issued its preliminary order, temporarily restraining the respondents and placing in charge of such bank the state examiner upon petition, which alleges, among other things, that the respondents are usurping the powers and duties of the state examiner; that arbitrarily, illegally, and wrongfully they had occasioned advance information to be given that such bank was to be closed and had caused a run to be made on such bank; that illegally and wrongfully, without the consent of the state examiner, they caused such bank to be closed and a temporary receiver to be appointed; that such respondents are attempting arbitrarily to invalidate large amounts of col-

46 N. D.—30.

lateral of such bank, are failing to make due collections thereof, and are about to sell great quantities thereof; that their arbitrary and illegal action, unless restrained, will financially wreck such institution; that public moneys are on deposit in such bank and the state bank guaranty fund are involved, as well as the powers and duties of the state examiner. Such petition seeks to invoke the exercise of the original jurisdiction of this court.

On the return day, October 15, 1919, the respondents filed a motion to dismiss upon jurisdictional grounds, and also their return and answer. On this day, the cause was orally argued and submitted. Pursuant to the order of this court, the parties have been granted until October 23, 1919, to make up and complete the record in this matter.

*Record Facts.*—Substantially, the facts, as disclosed by the record, are as follows:

For many years, the relator bank has been engaged in the general banking business as a state bank at Fargo, North Dakota. On September 17, 1919, this bank was examined by department of the state examiner through one of its deputies, the respondent Halldorson, and report thereof filed with the department. This report had been considered by the state examiner, conferences were held with the officers of the bank, and the recommendations made by the state examiner were being carried out as the evidence of the state examiner discloses.

On September 25, 1919, the state banking board, of which the respondents Langer and Hall constitute a majority, passed a resolution which reads as follows:

### Resolution.

"Whereas, an investigation of one of the banks or associations doing business in the city of Fargo, under the supervision of the state banking board, leads the banking board to believe that an attempt is being made to defraud some of the stockholders, and

"Whereas, this institution is in close relation to the other banking institutions in Fargo,

"Be it resolved, that the attorney general or his assistants, together with one or more bank examiners he may choose, proceed to Fargo immediately and conduct a thorough examination of any and all banking institutions doing business in the city of Fargo, North Dakota, under

the laws of this state; that said examination shall disclose the value of all stock of every nature and description, the amount of good and bad notes, together with all collateral, and any or all other things which, in the judgment of the attorney general, his assistants, or the men making the investigation, may be necessary to give the board complete information as to the value of the notes, the value of the loans, the value of the stock, and the value of the collateral within these various institutions, and that particular investigation be made to determine whether or not any crime has been committed on the part of any officers of the banks or institutions, and that the attorney general be given full power to act to protect any depositor, any stockholder, or the guarantee fund of the state."

The state examiner certifies to this resolution as secretary of the state banking board. On the same date he issued a letter to the respondent Halldorson, one of his deputy examiners, which reads as follows.

Mr. P. E. Halldorson, Deputy Examiner,
    Fargo, North Dakota.
Dear Mr. Halldorson:—
    You are hereby authorized to act under the direction of Attorney General William Langer in the examination of the Northwestern Savings & Loan Association of Fargo, and such other institutions in Fargo as he may deem necessary, with a view to ascertaining the truth of the charges made that this concern is attempting to freeze out some of its stockholders. You may also select any deputy examiner or examiners that you desire to assist you in this examination.     Yours truly,
                                    O. E. Lofthus, State Examiner.

On September 26, 1919, the respondent Sheets proceeded to Fargo, under the direction of the attorney general, possessed of the records and reports of the Northwestern Mutual Savings & Loan Association, a letter of authority to him and Attorney Lauder to fully act in the place and stead of said attorney general (which letters of instruction did not state upon what matter they should possess such authority), together with the letter from the state examiner to said Halldorson.

On September 27, 1919, Sheets in company with Attorney Lauder went to the bank, and, in accordance with the testimony of Sheets,

proceeded to go over the loans of the bank and check them. Attorney Lauder, in his affidavit, states that he is not a bookkeeper or accountant, and that he was not there for the purpose of making an examination himself, but to give advice upon any question of law that might arise. On September 28, 1919, the respondent Halldorson started to examine the bank, and on September 29, 1919, another deputy named Engemoen started to assist him.

Pursuant to this examination, Sheets, Halldorson, and Engemoen made and signed a report on October 1, 1919, covering a period of examination from September 27, 1919, to October 1, 1919, at 5 p. m., wherein they list various loans aggregating something over $734,000 as excessive loans, stating their general character to be extremely unsatisfactory, and the security in almost every case entirely inadequate. For many of these so-termed excessive loans the collateral or security is stated to the farmers' liabilities, represented by notes and postdated checks. For instance, there are four different loans described in such excessive loans list; namely: the Consumers United Stores Company, the National Nonpartisan League, the League Exchange, and the Publishers National Service Bureau list. These aggregate in round numbers, $443,000. The farmers' paper, which stands as collateral for such loans, amounts to over $970,000; there being some additional security amounting to over $29,000. The report estimates such farmers' notes to be not worth in excess of 50 per cent of their par value. As to the postdated checks it is their opinion that they are not collateral at all. That they are without validity or substantial value. There was also listed an itemized statement of bad debts amounting, in round figures, to $46,500, reported as of no value whatever. This report lists the resources and liabilities of such bank, showing that it had in loans and discounts (round figures given) $1,203,486; in deposits, private, $869,855; due to banks, $616,565, total deposits, $1,486,420; its capital, $50,000; surplus, $10,000; its cash on hand, $26,249; its amount due from banks, including collections in transit, $227,275; its excess expenses over undivided profits, $3,114. There is listed $169,973 past-due paper. The conclusion is reached that the bank is heavily over-loaned, that its reserve is below the requirements of law, and, if figured in strict accordance with law, would be several hundred thousand dollars less than no reserve, and finally, somewhat rhetorically, it is stated

that this bank presents a vast unwieldly $1,500,000 financial monstros-
ity, unable to take care of its obligations.    The recommendation is
that the bank's door be closed to protect the interests of the bank and its
patrons.

Apparently, without any delay after the receipt of this report, the
state banking board, though the respondents Hall and Langer, took ac-
tion; for at 11:20 A. M. on the next day, October 2, 1919, a telegram
was sent to respondent Halldorson by the attorney general, to the effect
that the banking board had adopted a resolution that the bank was insol-
vent to their satisfaction, and advising said Halldorson that he had been
appointed a temporary receiver by such board, with power and au-
thority to take charge of such bank.

In the meantime, on this day, something like a run was in course of
progress against this bank.    A depositor in the bank testifies that at
10 A. M. of that day he was advised to get his money out of the bank,
as it would be closed.    In St. Paul it was known at 10 A. M. that the
bank was going to be closed.    The clearing house in Fargo refused to
clear the items of such bank in the morning; all the banks in Fargo de-
manded cash for their items.    Such evidence is in the record not dis-
puted.    Upon receipt of the telegram, Halldorson secured a bond in the
sum of $100,000, and thereupon took charge of said bank on that day
about noon, and closed its doors.

The state examiner, who was absent from the state during this course
of procedure by the respondents, as well as his chief deputy, Semming-
son, who was the acting state examiner during his absence, both testify
that the closing of such bank was without their knowledge or consent.

On October 4, 1919, Sheets, Halldorson, and Engemoen made a re-
port to the attorney general supplementary to their original report,
previously mentioned, wherein they refer to a "Kiting" arrangement
with the Bank of Commerce and Savings, in Duluth, by which such
Duluth bank would accept discounted paper indorsed without recourse
by the relator bank as though it were purchased by them outright, and
without any contingent or other liability, with the understanding that
the amount carried should remain intact and on deposit with the Duluth
bank for purposes of assisting the bank's financial status when a "call"
or an examination was expected.

That in this regard in September, 1919, when Halldorson made his

regular examination, it was found that some $81,500 of paper had been charged to the Duluth bank and about the same time also some $14,000 more was so charged. Further, that the furniture and fixtures account which was carried on the books of the bank at $20,644, being as to that amount $2,000 in excess of that permitted by law, was, in fact, worth only $6,266.50 as determined by an appraisal made by one O'Shea, an architect. The conclusion is thereupon reached in this report that, by a consideration of the excess of expense over earnings, and the loss of the furniture and fixtures account, the capital is impaired to the extent of $7,492.77. The ultimate conclusion is then stated that this item, together with the past-due paper listed in the former report as bad debts and paper, which will result in a total loss, represent the facts upon which they have come to the conclusion that the bank is *hopelessly insolvent* without any reference to the condition of the excess loans. In this regard it may be noted here that the state examiner, in his evidence, however, states that this Duluth item was in fact charged back to the relator bank on September 17th, while Halldorson himself was there examining the bank for the reason that the Duluth bank wanted to hold such item as a credit not subject to check, and this arrangement was not satisfactory to the relator bank. Concerning the furniture and fixtures account, the state examiner states that the state architect has made an appraisal, and that the same justifies carrying such item within the legal limit $18,000, to which it has been reduced.

On October 6, 1919, application was made to this court by the relators. On October 8, 1919, this court issued its order herein pursuant to which the state examiner took charge of such bank until the further order of this court on October 8, 1919.

At the time of this hearing on October 15, 1919, he reports to this court that on the excessive loan list reported by Halldorson et al., $108,000 have been paid. That in many instances the amounts listed are incorrect, one credit item of $8,000 alone being noted in one instance. That he sees no apparent loss in the rest of the loans. That the total collateral securing the loans is $2,477,251.12. That the loans in the past few days have been reduced $169,000. That the legal reserve to-day (October 14th) is about $85,000 over besides $50,000 of Liberty bonds on hand. That he is satisfied the bank is not only solvent, but also retains its surplus and some undivided profits. He further finds

that said Halldorson's report is inaccurate, misleading and unjustifiable. He further states that the postdated checks of the National Nonpartisan League are desirable collateral, because they are in small amounts and spread over wide territory, and the history of their payment shows a wide margin of safety. The Equitable Audit Company of Minneapolis, a corporation chartered under the laws of Minnesota, in the accountant business, was employed by the relator bank to make an investigation and report on the condition of the bank. Such company made such investigation from October 7th to October 14th, 1919. Its report is in evidence before this court. It characterizes the report of Halldorson et al. in many respects to be incorrect and false. It reports that a thorough investigation has been made of the bank, and, in conclusion, states that the correct statement of the net worth of the bank is over $70,000, as follows: Capital stock, $50,000; surplus, $10,000; accrued profits, $10,000.

Halldorson has submitted no report to this court of his actions as temporary receiver. The state examiner testifies that Halldorson has refused to be checked out and be relieved of his responsibility. Remarkable as it may seem, Halldorson issued a signed letter to the state examiner that he was unable to identify or inform him as to the nature or quantity of the files and records removed from relator bank by Sheets during the time he assumed charge thereof. Deputy Examiner Engemoen, who signed the report with Halldorson, submits a sworn affidavit that his work in investigating the loans consisted of totaling up approximately $90,000 of loans. That about $1,113,000 of loans were not seen by him. That he did not investigate such loans and does not know anything of their value; that his conclusions were drawn mostly on statements made by Sheets and Halldorson, and that Sheets dictated the report. There are numerous affidavits concerning the specific loans questioned. They cannot be considered at length in this opinion. One illustration may be given. The Halldorson report lists loans to one Miller, aggregating $26,861.50, secured by a chattel mortgage on certain sheep and a second mortgage on a section of land in Clay County, Minnesota. This is listed as a dangerous loan, with security entirely inadequate, subject to a first mortgage for $15,000. There is evidence in the record, however, that this security is valued at $103,000, and that said Miller's personal net worth is over $207,000.

Various loans to Danielson brothers, aggregating $33,088, are likewise criticized as unjustified for the collateral behind the same. There is evidence in the record that Danielson has assets aggregating $199,000.

The officers of the bank have submitted a statement to the court bearing date October 14, 1919, and sworn to, concerning the list of bad debts classed as worthless by Halldorson and totaling the sum of some $48,000, as listed by him. Up to such date they show that six of such debts have either been paid in full or reduced. That much of such debts have either been removed or paid, the total amount thereof so removed or paid being $35,555.92.

The depositor's guaranty fund commission have submitted a statement to this court bearing date October 14, 1919, commending the state examiner, upon his report and that of the Equitable Audit Company, for the manner in which he has handled the affairs of the bank since he has been in charge.

On October 6th, before the district court of Cass county, North Dakota, an order to show cause was issued by the judge thereof in an action by the state on the relation of the respondent Langer, as Attorney General (leave to commence such action being granted), upon a complaint seeking to dissolve the relator bank as a corporation and to forfeit its corporate rights, privileges, and franchises, and to prohibit it from further carrying on the business of banking in this state. The complaint alleges as grounds simply that the liabilities of such bank are in excess of its assets, and that it is insolvent, and upon the further ground that it has made outstanding loans in excess of 15 per cent of its capital stock and surplus, setting forth a list aggregating $734,000, and that such bank has failed and refused to reduce such loans as requested by the banking board. The order to show cause was returnable October 13, 1919. The district court has proceeded no further in such action since the issuance of the original order of this court.

Bearing date of October 22, 1919, the state examiner and the president of the Equitable Audit Company have submitted an addendum statement concerning the relator bank, wherein there is shown as of date October 22, 1919, the net worth of such bank to be $71,284.71, being $11,284.71 over its capital stock and surplus. Also that the bank's reserve on that day was the sum of $372,661.91 or over $142,500 above the requirements of the state examiner's office. The state examiner re-

ports that of the amount due the banks, $572,902.10, each bank has stated its anxiety to co-operate, and will not withdraw its funds. That the Sisal Trust Loan, mentioned as an excessive loan in the Halldorson report, has been paid in full, being paid later than the compilation of the report. That the liquidation of notes, overdrafts, cash items, etc., aggregate $240,000; that the bank is in a good liquid condition. He requests that an **order for** reopening be given, the date thereof to be left to his discretion.

Since the oral argument the respondents have filed no additional evidence.

*Jurisdiction.*—Upon very technical grounds, the respondents assert that the preliminary order of the proceeding is neither process nor a writ, and that the court therefore acquired no jurisdiction. It is sufficient answer, without further consideration, to state that this court, in the exercise of its original jurisdiction, may frame its process as the exigencies require. State ex rel. Moore v. Archibald, 5 N. D. 359, 362, 66 N. W. 234. In matter of this kind it may issue an order to show cause as it has customarily done in a great number of cases for years.

The respondents further object to the jurisdiction upon the ground that no application was made to the attorney general to institute this proceeding. This technical objection is also without merit. It is true that ordinarily the consent or refusal of the attorney general should be secured in initiating the exercise of the original jurisdiction of this court, for the reason that ordinarily the attorney general is the legal representative of the interests of the state, its sovereignty, franchise, and liberties of the people. However, the contention is absurd that an application should be made to that officer in an action in which he is in fact one of the parties defendant, and which concerns his alleged wrongful acts, and seeks to restrain them. The law does not require futile acts. The original jurisdiction of this court is not to be denied merely because the attorney general happens to be one of the respondents. This court has heretofore held that it may exercise its original jurisdiction upon the petition of a private relator even though the attorney general expressly disapproves of the proceeding. See State ex rel. Moore v. Archibald, 5 N. D. 359, 376, 66 N. W. 234; State ex rel. Erickson v. Burr, 16 N. D. 581–586, 113 N. W. 705; State ex rel. Byrne v. Wilcox, 11 N. D. 329, 335, 91 N. W. 955; State ex rel. Shaw v. Har-

mon, 23 N. D. 513, 514, 137 N. W. 427; State ex rel. McArthur v. McLean, 35 N. D. 203, 212, 159 N. W. 847; State ex rel. Byerley v. State Canvassers, 44 N. D. 126, 172 N. W. 90.

Again the respondents further contend that this cause does not present a case requiring the exercise of its original jurisdiction in that it does not involve the sovereignty of the state, its franchises, or prerogatives, or liberties of its people; that the action is not of public concern, involving merely private rights on the relation of private parties.

Upon this record this contention is wholly without merit. This court has exercised its original jurisdiction in many other cases for years, upon much more remote grounds than those plainly evidenced herein.

For instance, in State ex rel. Birdzell v. Jorgenson, 25 N. D. 539, 49 L.R.A.(N.S.) 67, 142 N. W. 450, the relator formerly a tax commissioner, now a member of this court, invoked the original jurisdiction of this court to compel the state auditor to make payment of his salary as a member of the tax commission. In the recent action of State ex rel. Wallace v. Kositzky, 44 N. D. 291, 175 N. W. 207, the original jurisdiction of this court was exercised for a like purpose. In the very recent case of State ex rel. Amerland v. Hagan, 44 N. D. 306, 175 N. W. 372, on the relation of a private individual, this court invoked its original jurisdiction to consider the provisions of the Compensation Act as they affected the rights of such private relator. In the recent action of State ex rel. Stearns v. Olson, 43 N. D. 619, 175 N. W. 714, upon the application of a private relator, this court exercised its original jurisdiction to consider the right of such private relator to receive the payment of a voucher issued to him by the Workmen's Compensation Bureau from the state treasurer. In other actions now pending before this court (State ex rel. Farwell, O. K. & Co. v. Wallace, 45 N. D. 181, 177 N. W. 106, and State ex rel. Capital Trust & Sav. Bank v. Wallace, 45 N. D. 209, 177 N. W. 451) the original jurisdiction of this court is being exercised for the consideration of the rights of private relators to be exempt from taxation under the moneys and Credits Act enacted by the last legislature. See State ex rel. Granvold v. Porter, 11 N. D. 309, 91 N. W. 944; State ex rel. Buttz v. Lindahl, 11 N. D. 320, 91 N. W. 950; State ex rel. Mitchell v. Larson, 13 N. D. 420, 101 N. W. 315; State ex rel. Baker v. Hanna, 31 N. D. 570, 154 N. W. 704; State ex

rel. Linde v. Packard, 32 N. D. 301, 155 N. W. 666; State ex rel. Linde v. Taylor, 33 N. D. 76, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583; State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281; Etate ex rel. Linde v. Packard, 35 N. D. 298, 160 N. W. 150; State ex rel. Langer v. Packard, 40 N. D. 182, 168 N. W. 673; State ex rel. Twichell v. Hall, 44 N. D. 459, 171 N. W. 213. In a large number of cases since statehood this court has defined and exercised its original jurisdiction. It not only has determined that it does possess an original jurisdiction, in addition to its appellate jurisdiction and superintending control over inferior courts, but that the question of whether the original jurisdiction of this court so concerns the sovereignty of the states, its franchises, or prerogatives, or the liberties of its people, and is a matter of such public concern as demands the attention of this court, is peculiarly a matter addressed to the discretion and determination of this court. State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955; State ex rel. Erickson v. Burr, 16 N. D. 581, 586, 113 N. W. 705.

The relator bank is a large banking institution in this state; it has on deposit moneys of many other banks. There are also on deposit public funds of the state deposited through the Bank of North Dakota to the credit of the Agricultural College. The depositors' guaranty fund, enacted to protect bank depositors in 1918, is directly involved in its administration, and affects in a manner every state bank in this state. The powers and duties of the state examiner, and the authority of the state banking board under the laws of this state, are directly concerned.

Further, the acts of the respondents in suddenly closing this bank practically without warning, and installing a temporary receiver in charge thereof, without the knowledge or consent of the state examiner, and in suddenly causing telegrams to be sent to so-termed associated banks of such bank throughout the state, and in determining that certain forms of collateral held in this bank, as well as in many other banks of this state, is improper collateral and of doubtful value, have occasioned unprecedented public interest and public concern not only in this bank, but in the banks of this state concerning their solvency, concerning the operation of the banking laws of the state, and even the credit of the state. Upon this record it is indeed an idle assumption for the respondents to contend or assert that this cause involved merely

the private rights of the relator. It not only concerns the prerogatives of the state government and the liberties of its people, but it concerns in a very large manner the sovereign powers of the officers concerned and the rights of numberless depositors. It is of considerable importance, in view of the widespread consequences that might ensue from the action taken by the respondents, that this court should exercise, as it did exercise, its original jurisdiction in this matter.

The respondents further object, upon jurisdictional grounds, to the order of this court which placed in charge of the relator bank the state examiner of this state until the further order of this court. It is contended that the principle of law applies, that a preliminary injunction will not be granted to take property out of the possession of one party and transfer it to the possession of another. This general proposition of law has no application. At the time when the respondents acted and placed Halldorson in charge of such bank as temporary receiver, the bank was a going concern, operating under its own officials as a public bank. This court, by its temporary order, did not restore this bank to its bank officials. It indeed was necessary, upon the face of the petition as presented, to see that no further proceedings be taken through the acts of the respondents, so that the questions presented in the petition might become moot before this court was able to hear and determine the issues. This court might properly have appointed some third party to take charge of this bank. It saw fit to place in charge thereof the state examiner, the official ordinarily charged with that duty. The respondents contend, and thereby admit, that the state examiner as a relator is a total stranger, without any interest in the rights of such bank. They make no contention that he has not properly performed his duties while in charge of such bank, under the orders of this court. Indeed it amply appears from this record that this court very properly and timely placed in charge of such bank the state examiner in view of the admission in the record of said Halldorson, the temporary receiver of the respondents, that he did not know, during the time he was in charge, just what papers had been taken from such bank, by reason whereof he could not check out with his successor the state examiner.

*Extent of original jurisdiction.*—When this court takes cognizance of a cause in the exercise of its original jurisdiction, it has the authority

to determine every issue of the law and of fact that arises in the record, if deemed necessary for a consideration of the issues presented.

It may act as a court of equity; it may take testimony (Re Sidle, 31 N. D. 405, 154 N. W. 277); it may issue all necessary writs and all necessary orders to effectuate its jurisdiction as assumed (State ex rel. Moore v. Archibald, 5 N. D. 355, 66 N. W. 234; State ex rel. Poole v. Nuchols, 18 N. D. 233, 20 L.R.A.(N.S.) 413, 119 N. W. 632; State ex rel. Red River Brick Corp. v. District Ct. 24 N. D. 28, 32, 138 N. W. 988).

Accordingly this court may consider and determine fully the cause of the parties presented upon the record pursuant to legal or equitable principles of law that apply.

*The merits.*—In addition to the contentions concerning the jurisdiction of this court the respondents assert:

1. That the state banking board have the authority to appoint a receiver, upon being satisfied of the insolvency of a bank, without the knowledge or consent of the state examiner.

2. That the matter of determining a bank to be insolvent is within the discretion of such banking board, and that the act of the board so determining is not subject to review in this court, no matter whether the bank was in fact solvent or insolvent.

3. That the question of solvency or insolvency of such bank is not before this court, but only the question of the power of such banking board.

4. That postdated checks, constituting a large line of collateral in such bank, are not collateral at all, and of no substantial value.

5. That, in computing the legal reserve of banks under the law, there must first be deducted amounts of deposits due to banks.

6. That in any event, upon the report submitted, the relator bank is hopelessly insolvent.

In respect to the power of the state banking board to appoint a receiver of its own volition without the suggestion, consent, or knowledge of the state examiner, it is contended that this power is specifically granted in § 5146, Comp. Laws 1913, which is not in any manner repealed by chapter 53 of the Laws of 1915, which grants to the state examiner the power to appoint a receiver with the approval of the state banking board.

In order to understand the construction to be placed upon the existing provisions of law concerning the powers of the state examiner and the state banking board, it is quite proper to review briefly the legislation in this state in that regard.

In 1890 (Laws 1890, chap. 23) the public examiner was made *ex officio* superintendent of banks, with the power of examining banks. It was further provided that any bank refusing to comply with any lawful order of the examiner for a period of ninety days after demand in writing should be deemed to forfeit its franchise.

In 1893 (Laws 1893, chap. 27) it was provided that the public examiner, upon being satisfied of the insolvency of any bank after examination of the same, and, after having consulted with the board of directors, might forthwith apply to the district court for the appointment of a receiver.

In 1897 (Laws 1897, chap. 31) it was enacted that the state examiner, on becoming satisfied of the insolvency of a bank, after making an examination of the same, should forthwith take charge of such bank pending action of the court, and should immediately submit a statement to the attorney general, who should institute action in court against such bank.

In 1905 (Laws 1905, chap. 165) the state banking board was created. It became the duty of such board to examine all reports of banks which should be filed with it by the state examiner. It further provided that orders made by such board should be operative and remain in force until modified, amended, or annulled by the court of jurisdiction. It further provided (§ 29 which is now § 5176, Comp. Laws 1913) that any bank which refused to comply with any requirement lawfully made by the state banking board or by the state examiner, for a period of ninety days or for a lesser period as specified in the order after demand in writing by such board of examiner, shall be deemed to have forfeited its franchise, and failure to comply shall work forfeiture of its franchise. That in either case, the attorney general, upon demand of such examiner or board, must commence action for the purpose of annulling the existence of such bank. It further provided (§ 34 now § 5183, Comp. Laws 1913) that the state banking board, on being satisfied of the insolvency of any bank or of the violation of any provisions of such laws of 1905 by such bank, after examination of the same, shall forth-

with take charge of such insolvent bank pending action of the court. For that purpose it was made the duty of the board to appoint a temporary receiver, and such receiver, upon taking charge, is required to prepare and submit a statement to the state banking board, who should thereupon institute an action against such bank. It is further provided (§ 40, which is now § 5189, Comp. Laws 1913) that a bank shall be deemed insolvent in the following cases:

1. When the actual cash market value of its assets is insufficient to pay its liabilities.

2. When it is unable to meet the demands of its creditors in the usual and customary manner.

3. When it shall fail to make good its reserve as required by law.

4. When it shall fail to comply with any lawful order of the state banking board within any time specified therein.

In 1911 (Laws 1911, chap. 55) § 1 of chap. 165 of said Laws 1905, § 4635, Code 1905, was amended, in a respect material to this controversy, by providing, in addition to the authority theretofore granted and possessed by the banking board, that it was vested with the power and authority to appoint, by its own order, receivers for an insolvent corporation, with the same power as if appointed by the district court, but that nothing therein stated should be construed so as to take away from the court the power to appoint receivership of such institution of such bank at any stage of the proceedings. The board also were granted the power to make rules and regulations for the government of banking corporation. This is now § 5146, Comp. Laws 1913. This act in 1911 did not effect the other provisions of said Act of 1905, which have been carried into the 1913 Compiled Laws, as hereinbefore stated.

In 1915 (Laws 1915, chap. 53) § 5189, Comp. Laws 1913, which was § 40, chap. 165, Laws 1905, was amended and re-enacted. It provides, in addition to the instances when a bank is deemed to be insolvent, as follows.

1. That the property of a bank is not subject to attachment or levy, nor shall a receiver be appointed during such reasonable time as the state examiner may require for examination.

2. After such examination, if the state examiner shall deem best, he shall, with the approval of the state banking board, appoint a receiver who shall take possession under the direction of the state examiner of

books, records, and other property, collect the debts, sell or compound bad or doubtful ones, and sell all corporate property on such terms as the state examiner shall direct, etc.

3. He, the receiver, shall pay over all the moneys received by him, and make report of his doings to the examiner, at such times and in such manner as he may prescribe.

4. Whenever, after report by such officers and before the appointment of a receiver, said examiner shall find the bank in such condition that all creditors aside from stockholders can be paid in full from its assets, he may relinquish possession of its property to its proper officers, provided, however, that the bank shall pay the state examiner a fee of $10 per day and the hotel and traveling expenses of the state examiner or deputy state examiner who shall have been in charge of the bank during this period, and such bank may, with the consent of the state examiner, resume business upon such conditions as may be approved by him.

5. Upon taking possession of the property and business of such bank, the state examiner is authorized to collect moneys due to such bank and to do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof.

These provisions of chapter 53, Laws 1915, granting new and specific powers to the state examiner, are set forth fully for the reason that they have a material bearing concerning the powers of the state banking board, and the construction to be placed thereupon after the passage of said chapter 53.

In 1917 the Depositors Guaranty Act (Laws 1917, chap. 125) was enacted. It provides for a depositors guaranty fund commission, composed of the governor, the state examiner, and three members to be appointed by the governor. Such appointees to be members of the North Dakota Bankers Association. The act makes it the specific duty of such commission to pass upon the qualifications of every bank for admission under such fund. It provides that every bank in the state shall be subject to the provisions of such act. It further provides that, when the condition of any bank under such act becomes such as to cause the state examiner to doubt the advisability of permitting it to continue in business, it shall be within his power to require the advice and opinion of the commission thereupon. It is not denied nor doubted in this

proceeding that the relator bank becomes subject to the provisions of this act, and that its qualifications were passed upon by the commission, nor that this right to so be subject to the terms of such act has been either questioned or revoked by such commission.

A simple consideration of these provisions of the existing statutory laws, as enacted by the legislature (not as stated in the Compiled Laws), makes the rules of construction applicable so plain almost that "he who runs, may read."

The respondents contend that said chapter 53, Laws 1915, purported only to mean § 5189, Comp. Laws 1913, and that, therefore, it did not repeal § 5146, Comp. Laws 1913.

The Compiled Laws of 1913 are merely a compilation. They are neither a code nor a revision. It is plain to see that these provisions, as stated in chapter 28, Comp. Laws 1913 (§ 5146 to § 5191), are merely a restatement of the law as enacted in 1905 pursuant to chapter 165 thereof, excepting as they have been amended as to the provisions herein stated by chapter 55, Laws 1911.

Accordingly the provisions of the Laws of 1905 as amended in 1911 have been again amended by the Act of 1915, chapter 53. The power granted to the state examiner pursuant to the Act of 1915 is plain and definite. There is no difficulty in construing this power to be exactly as stated, to wit, that the state examiner, after he has made an examination, shall, if he deems best, with the approval of the state banking board, appoint a receiver, who shall take possession not under the direction of the banking board, but under the direction of the state examiner. In part this Act of 1915 was enacted through the litigation had and the legal situations resulting in the well-known case of Youmans v. Hanna, which finally found its way to this court, and was decided in 35 N. D. 479, 160 N. W. 705, 161 N. W. 797, Ann. Cas. 1917E, 263. In that case a bank at Minot was closed through the action of the state banking board.

It is a well-settled rule of law, where two legislative acts are repugnant to or in conflict with each other, that the latest expression of the legislative will must control, even though it contains no repealing clause. 36 Cyc. 1073, chapter 53, Laws 1915, gave to the state examiner di-

rectly the power to appoint a receiver to take charge of insolvent bank, to investigate concerning insolvency, and to have charge of such bank during the process of a receivership.

Theretofore this power was possessed pursuant to § 5146, Comp. Laws, 1913, by the state banking board. The legislative intent in this act is clear. In the bill as first introduced in the legislature (House Bill No. 344) the act provided that the state examiner, alone, shall appoint a receiver. There was also a fifth provision, providing for a bank being deemed insolvent when its books of account are falsely or fraudulently kept. In the passage of the bill in the house, the provisions concerning keeping books falsely or fraudulently was stricken out. In the senate, the bill was amended by inserting, concerning the power of the state examiner to appoint a receiver, the words, "with the approval of the state banking board." This discloses clearly that the legislature had in mind the granting of this power expressly to the state examiner.

Under the law as now existing the state examiner is neither a puppet nor a figurehead. The law does not contemplate the banking board performing the duties of the state examiner. There is no difficulty in apprehending and making harmonious the duties of the state banking board. They have the power of regulating and providing rules for banking corporations in this state. They have the right to prescribe orders with which the banks must comply in this state. But the initiative action in securing compliance, in determining insolvency, in protecting through executive action the state depositors and stockholders, lies through the state examiner.

It is further to be noted under the now existing law (Laws 1915, chap. 53) it is specifically enacted that no receiver shall be appointed during such reasonable time as the state examiner may require for examination. Further, that even before a receiver is appointed, the state examiner may take possession, and thereafter release such possession to the bank officials, without the necessity of any receiver at all. The legislative idea and intent is plain and clear that there should not be a financial wrecking of banks in this state (for a receivership is ordinarily a financial wrecking of a bank as an institution), if otherwise, the best interests of the public of depositors, and of the bank itself, can best be subserved by the action of the state examiner himself. Indeed the act must have plainly intended to guard against the situation

created in the closing of the Minot Bank and such arbitrary action without warning as has been taken by the respondents herein.

The record discloses neither knowledge nor any initiative action by the state examiner in the proceedings which lead up to the receivership of the respondents. The first resolution passed by the banking board concerning the investigation of banks in Fargo gave no information to the state examiner that the relator bank was the bank against whom action was to be taken. The letter of the state examiner to his deputy, Halldorson, concerned not the relator bank, but another bank in Fargo; in fact, this resolution and this letter would appear on its face as an attempt indirectly and by subterfuge to secure the consent of the state examiner to examine all the banks in Fargo so that thereby initiative action might be taken against the relator bank as it was taken. It therefore follows that the action of the state banking board, through the respondents, who constitute a majority thereof, was illegal and unauthorized. Even though it should be conceded that the state banking board did possess the power to close such bank and appoint a temporary receiver thereover, nevertheless, the action as taken by such banking board was unreasonable, arbitrary, unjust, and cannot be upheld. It seems strange indeed that the respondents, who have constituted members of such banking board ever since January 1, 1917, and who by law are charged with the bounden duty of examining reports of banks, and who were therefore presumed to be familiar with the condition of this bank from that time, should act with such seeming haste, without the consent, knowledge, or action of the state examiner, at a time when he is out of the state, and in a manner so as to grant to such relator bank no time whatsoever to comply with any of its orders or demands. The closing of a bank, a large institution like this bank, is not a matter of idle concern, either public or private.

The act of the respondents, as initiated, and consummated, irrespective of the question of intent, accompanied with widespread publicity and specific notice to other banks in this state of their action, could not do otherwise than occasion alarm and doubt in the minds of the public and of depositors in the soundness of the banking institutions affected, as well as in all banking institutions in the state. Banking institutions, for their immediate solvency, depend upon the public confidence. No bank is immediately solvent if this public confidence is destroyed and it

cannot secure the aid of other banks to help in restoring this confidence. The acts of the respondents, as disclosed in this record, jeopardized this solvency of the relator bank as well as other banks.

From statehood to the present, the statutory provisions concerning the examination and regulation of banks have contemplated a course of conduct by state officials in enforcing the banking laws which would not create public alarm and distrust in banking institutions of this state, but which, by constant examination, supervision, and regulation would secure compliance with the laws. Throughout the statutes there is shown an intent to give time to a banking institution within which it may make compliance with any order or regulation of the authorities, if there is an ability on the part of the bank to so comply. No time whatever was granted by the respondents. The report of the state examiner while he has been in charge, the acts of the bank officials and stockholders, show that there was and is an ability and a readiness to comply with any lawful order that the respondents might have prescribed.

It is to be noted that the acts of the respondents, from the beginning up to the time this court interposed its original jurisdiction, disclose no desire and evidence no attempt to protect the public moneys, the guaranty fund, the moneys of depositors, or the property of the stockholders, by granting to the bank any chance or opportunity to comply with the findings of the banking board, or to rehabilitate itself in accordance with the board's determinations. No one of the respondents even suggests to this court that, if the receivership is continued under their supervision, the bank might or could restore itself as a solvent bank. On the contrary it is the contention of the respondents that this bank is hopelessly insolvent, which simply means that public moneys, the guaranty fund, and the moneys of depositors are imperiled. This contention was reenforced by the action which they instituted in the district court, seeking to dissolve the bank corporation and forfeit its franchise.

There is no other manner in which this procedure can be characterized other than arbitrary, and contrary to both the spirit and letter of the law. It both merits and receives the condemnation of this court.

The question of whether this bank is insolvent is before this court. If this relator bank at the time of its close had assets of actual cash market value sufficient to pay its liabilities; if it was able to meet the

demands of its creditors in the usual and customary manner; if it was able to make good its reserve as required by law; if it was able, within a time specified, to comply with the lawful orders of the state banking board, it was not insolvent, and the action of the respondents declaring it so to be was merely arbitrary and without justification. The record discloses no specific order of the banking board that this relator bank has not complied with, or was not able to comply with in a specific time. The record does not disclose inability of the relator bank to make good its reserve fund as required, in accordance with the contention of the respondents.

The record does not disclose that, on the day this bank was closed, it was unable to meet the demands of its creditors in the usual and customary manner. On the contrary, it is shown that it was able to and did do so. The only remaining ground is whether its assets are of sufficient actual cash market value to pay its liabilities. If they are not, and the capital and surplus are thereby impaired, the statute specifically provides for a method of rehabilitation of such capital and surplus. Comp. Laws 1913, § 5186. Neither demand was made nor time given by the respondents for restoration of the capital and surplus which, under, the contentions of the respondents, were impaired. The facts that under the charge of the state examiner, this bank, in the space of a few short days, has been able to collect on paper that was deemed worthless by the examiner Halldorson; that he has been able to cause payment upon, or a reduction of, many of the so-termed excessive loans; that he has been otherwise able to collect a large amount of money on paper due the bank,—justly throw discredit upon the report and conclusion adopted by Halldorson and his associates. The fact that there are excessive loans carried, or that improper banking methods have been carried out, does not itself prove insolvency of the bank. The very fact that upon the loans listed as worthless debts, something like $10,000 of debts were paid by the persons themselves and some $25,000 by the directors or stockholders of the bank, shows an ability to respond to the demands of the banking authorities. These facts, indeed, do not indicate lack of assets or of ability on the part of the bank to pay its liabilities. Instead of indicating a state of insolvency, they rather demonstrate, on the contrary, solvency.

The respondents finally resort to the contention that the legal reserve

of the bank, at the time of the closing of such bank, was not, and for a long period of time had not been, maintained as required by law. In support of this contention they quote the statutory provisions which require a bank, in computing its legal reserve, to deduct therefrom deposits of banks owing by it.

No order is disclosed to this court that the banking board have so required the state banks in this state. On the contrary the practice customarily shown and necessarily known to the respondents has been to treat such deposits of banks as demand deposits. The reserve required by the laws of this state for state banks is high. It is known to be higher than that required of Federal banks. Section 5170, Comp. Laws 1913, does require that the legal reserve of a state bank be computed by deducting therefrom the amount due other banks.

Judge Engerud, in his legal opinions for bankers of the North Dakota Bankers Association (1909–1916) p. 32, states as follows:

"The above provisions of law to which you call my attention is certainly a very peculiar one. It is apparently a discrimination against state banks in favor of national banks. The language of the provision literally construed indicates that the amount due to other banks from a state bank must be constantly kept on hand, and that such fund must be deducted from the available funds in computing the reserve required by law. I can think of no good reason for such a provision, unless it was intentionally put in as a discrimination against state banks.

"I might suggest, however, that in actual practice in the administration of national banks, it is the practice in commuting the reserve required by law to distinguish between individual deposits and bank deposits. In the administration of the National Bank Act the amount due to other banks, not reserve agents, is taken to be the difference between the total amount due to other banks and the total amount due from other banks. This difference is added to the total individual deposits, and the lawful money reserve computed on that sum."

The respondents, however, assert that such is the law. That the statute (Comp. Laws 1913, § 5189) states the failure to maintain its legal reserve is a ground of insolvency. That, therefore, the insufficiency of such legal reserve of the bank formed a ground for the action of the respondents declaring such bank to be insolvent even though their own receiver Halldorson, the state examiner, and banking board itself,

had not theretofore required the banks of this state to so conform to the strict requirements of the statute.

This simply serves to emphasize the nature of the discrimination sought to be applied to this bank in order that it may be deemed insolvent.

Upon this record the respondents are not in a position to justify their action in declaring the bank to be insolvent, upon the grounds of its failure to maintain its legal reserve. Not in this manner may be banking board play fast and loose with its powers. The statute (Comp. Laws 1913, § 5170) specifically prescribes that the banking board shall give notice to a bank, when its legal reserve is not as required by law, to make good such reserve; that if, within a period of thirty days after such notice, it shall fail to so restore its reserve, the banking board may impose a penalty as prescribed in the statute. No notice order of proceeding of this kind by the banking board has been disclosed in this record.

The respondents must now resort, for purposes of establishing insolvency, to the list of loans mentioned in their report consisting of about $740,000, which they assert to be secured by insufficient and improper collateral, consisting largely of farmers' notes and farmers' postdated checks, the amount of which aggregates over $1,400,000. The contention is made that a postdated check is not collateral, that farmers' notes should not be estimated over 50 per cent of their value. That, therefore, this large list of notes owing to the bank are without sufficient security and should be removed or discounted accordingly. To support a conclusion in this regard they have simply a hearsay statement that large amounts of such farmers' paper did not pay out or paid up poorly. This hearsay statement contained in the record is denied by the persons whom they state were the authors thereof. There is much evidence in the record, as well as the report of the state examiner that this farmers' paper is good collateral; that there is a good margin of safety on the security offered, and that uniformly it has paid out well, in percentages from 75 per cent to 85 per cent. There is neither reason nor justification for declaring farmers' paper to be worth only 50 per cent of its value; on this record there is not presumption, and certainly should not be in this state dependent on agriculture and owing its prosperity to the farmers of this state, that farmers' paper is any worse or poorer than any other paper of private individuals.

There is more reason for declaring farmers' paper to be of a certain percentage of value than there is for declaring lawyers', doctors', or merchants' paper to be of a certain percentage value. In all instances it is a question of the financial worth and integrity of the individual whose paper is pledged.

The respondents, however, contend that a postdated check is a bill of exchange payable on demand. That when accepted by the payee it ceased to be a check, and becomes a bill of exchange, and that the maker and indorsers are relieved from all responsibility, and if matured it becomes a certified check. That a bill of exchange is like a postdated check in that, until it has been accepted by the payee or accepted in writing, all legal defenses attached thereto; that it is not a negotiable bill of exchange, and any bank taking the same as collateral is securing not collateral, but the probability of a lawsuit. This is indeed a novel exposition for a legal argument, and far from the law. A check is a negotiable instrument. Comp. Laws 1913, §§ 7069, 7171. It is true that it is defined that a bill of exchange drawn on a bank is payable on demand. The maker and indorser of a postdated check are liable in accordance with the same rules that apply to negotiable paper. The indorser, as well as the drawer, engages that upon due presentment it will be accepted or paid or both according to its tenor, and that if it be dishonored and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder or to any subsequent indorser who may be held to pay it. Comp. Laws 1913, §§ 6951, 6946. The fact that a postdated check is negotiable prior to the day of its date does not put purchasers upon inquiry by reason of that fact. See notes in 29 L.R.A. (N.S.) 375, and 44 L.R.A.(N.S.) 405. A postdated check, by its very terms, is not due or payable on demand at the date thereof. Payment cannot be legally taken from the drawee bank prior to that time. Prior to that time the drawee bank ordinarily has no right to certify concerning the same. L.R.A.1917F, 1099. Judge Engerud, a former member of this court, has well stated the principle of law applicable in his book "Legal Opinions for the North Dakota Bankers Assoc. (1909–1916) p. 167, as follows:

"A postdated check would be analogous to an ordinary bill of exchange payable at a future time, the time of payment being the date of the check; and can consequently be negotiated like any other bill of

exchange, and every party through whose hands it passes who indorses it becomes liable as an indorser. When you receive such a check you would take it the same as any bill of exchange payable in the future, and on the due date present for payment, and if dishonored give the proper notice of dishonor. All prior indorsers would then be liable to you for the amount of the check and the protest fee."

It is apparent, therefore, that the acts and contentions of the respondents in attempting to establish by presumptive fiat that postdated checks are of no substantial value, and thereby, at one fell sweep to render practically valueless or insufficient all paper for which such postdated checks, as well as other farmer notes, stand as security, are not only presumptious, but without foundation in law.

What was the intention of the respondents herein in the acts performed, this court does not deem necessary to determine.

The acts themselves, however, are judged by this court. It is determined that there is such a thing as a public conscience, and that these acts, upon the record submitted to this court, were unwarranted, unreasonable, and without foundation of law. The record in this case discloses that the state examiner placed in charge by this court has been diligent in performing his duties, that he has made every effort to conserve both public and private interests, that by his energies the bank, through the co-operation of its officials, his disclosed an ability to comply with all of the lawful orders of the banking authorities of this state; that, in accordance with his report, such bank is not only solvent, but retains both its original capital and surplus unimpaired, as well as some undivided profits. The interests of this state and the credits of its financial institutions at hand and abroad have been needlessly jeopardized, and public alarm has been likewise needlessly created. It is therefore ordered that the order of this court placing the state examiner in charge of the relator bank be made permanent, with full right to such state examiner to grant permission to such relator bank to resume business whenever he deems it proper for them so to do; and it is further ordered that the temporary restraining order issued against the respondents herein be made permanent as to such respondents and all agents and employees of such respondents. It is further ordered that all costs of the relators herein be taxed against the respondents before the clerk of this court, and that the relators have judgment and execu-

tion therefore as provided by law. Let judgment be entered pursuant to this order.

ROBINSON and GRACE, JJ., concur.

ROBINSON, J. (concurring). This case must be of public concern and of no small importance; from the start special and high-priced counsel have been employed at the expense of the state, and in the newspapers it has been the leading subject of discussion. The case presents a quarrel between the governor and his political family, and it involves an attack on the Farmers' Nonpartisan League and their managers because of their dealings with the bank.

The state banking board consists of the governor, the attorney general, and the secretary of state, with the state examiner as secretary. Some three weeks ago, on the ground that the bank was insolvent, the attorney general and the secretary of state made an order that Halldorson take possession of the bank as temporary receiver. 'It was done against the protest of the governor, and with an affected and hostile purpose of putting the bank out of business. Then, on October 7, 1919, on due application, this court made an order that defendants show cause why they should not be enjoined from closing or interfering with the bank, and that, pending the hearing, defendants relinquish to the state examiner possession and control of the bank. Now, on the arguments and proofs submitted, it devolves on the court to determine the matter.

This, the proof does fairly show.

1. The proceeding against the bank was commenced and conducted in a hostile and unfriendly spirit, with needless force, high-priced attorneys and accountants, regardless of expense, and that defendants proceeded to take possession of the bank and to give out reports highly detrimental to it and its stockholders and depositors. The bank was not insolvent, and it is entirely clear that were it not for the timely action of this court it would have been "bled white" and put out of business, to the great loss and damage of the state and public welfare. In six days after the examiner took possession, his report to the court shows that the bank is not insolvent; that it has in cash $350,000, and that, on paper which defendants rated as not bankable, the examiner has col-

lected $169,000.  Now, on this October 23d, the day set for the final submission of proof, the report of the examiner shows the bank is solvent and that it is well prepared to do business.  It has on hand in the vault $200,000, and with approved banks, $129,000, and Liberty bonds over $43,000, and that a large amount due from other banks is available so that the bank is in good liquid condition.

But it is insisted that this court has not jurisdiction, and that it should now follow the example of him who took water and washed his hands, saying: I am innocent of the blood of this just man, see ye to it.  Then in the language of Scripture, it might be well said: Therefore is judgment far from us, neither doth justice overtake us; we wait for light but behold obscurity; for brightness, but we walk in darkness.  We grope for the walls like the blind, and we grope as if we had no eyes; we stumble at noonday in the night.  And judgment is turned away backwards and justice standeth afar off, for truth is fallen in the street and equity cannot enter.  But such is not the condition; the supreme court is supreme.  It has justice over all other courts, state banking boards, and all other such administrative boards, and it may say to each of them:  Thus far shalt thou go, and no further.  Manifestly it is within the power and duty of the supreme court to use and adopt such measures as may be necessary to enforce and protect all the constitutional guaranties of life, liberty, and property.  It is not competent for the lawmakers to give arbitrary power to any board or body of men.  Every power is given on condition that it must be used justly, fairly, and honestly, and not in an arbitrary manner.  If two members of the banking board have power to override the governor and the state and the public examiner and to appoint a receiver, the act must be justified by the statute and by some special emergency.  The governor is chairman of the board, and the public examiner is secretary.  His special duty is to know when a bank is insolvent.  Even the full board cannot appoint a receiver of a bank unless it is actually insolvent.  Comp. Laws, § 5146.  The board has no discretion whatever only in cases of actual insolvency.  Thus, by statute, the live-stock board is given power to kill animals affected with contagious and infectious diseases.  § 2686.  But, as the court has held, the board has no power to kill animals that are not actually infected with the disease.  The ani-

mal must be actually insolvent.  Neer v. State Live Stock Sanitary Bd.
40 N. D. 340, 168 N. W. 601, 18 N. C. C. A. 1.

Now as it appears that the bank is not insolvent, and, on the con-
trary, its solvency is fully assured, and the defendants have no right
to insist that they be permitted to wreck it.  Indeed they have no legal
interest in the matter; they have no rights to protect.  They represent
neither the bank nor its creditors, depositors, or stockholders; neither
the state nor the public welfare.  Hence, the judgment of this court is,
and must be, to the effect that the bank be restored to the full right to
do and transact its ordinary business without let or hindrance, and that
all proceedings against it be dismissed, with costs.

Filed October 31, 1919.

Birdzell, J. (dissenting).  I dissent.  At the time the original ap-
plication in this matter was presented to this court I was of the opin-
ion that this court did not possess, under the Constitution, the requi-
site original jurisdiction to deal adequately with the matters presented
in the complaint.  The matter of jurisdiction required decision then
if the court was to issue the order prayed. for; for the plaintiffs re-
quested that a restraining order issue at once which would have the
effect of removing Halldorson, the receiver appointed by the banking
board, and of placing the bank in the control of the public examiner.
It was also asked that the banking board be immediately restrained
from invalidating postdated checks as collateral security.  This re-
straining order was asked for without notice and upon an *ex parte* ap-
plication.  It appeared clear to me that it should not issue unless this
court was possessed of the requisite jurisdiction not only to disturb the
existing status to the extent requested, but to determine fully the merits
of the controversy foreshadowed by the complaint.  I was of the opin-
ion that this court did not possess, under the Constitution, the requisite
original jurisdiction, and further reflection has confirmed that opinion.
The majority of the court, however, assumed jurisdiction and issued
the order.  That action brought the matter here for such future pro-
ceedings as might be deemed appropriate.  It was a justifiable assump-
tion at the time that, upon the return of the order to show cause, the
temporary order would be dissolved, if sufficient showing were made
by the respondents to justify them continuing the course they were
pursuing; or, if not, that it would be continued pending a trial of the

issues on the merits. But so far as the assumption related to a trial on the merits, it proved to be altogether too liberal, as will appear presently.

Prior to the return day the attorney general had asked for an interpretation of the injunctional order with reference to its effect upon certain proceedings which had been begun by him, under §§ 7990 or 8004, Compiled Laws of 1913, in the district court of Cass county. These proceedings were predicated partly upon the alleged insolvency of the Scandinavian American Bank, and were brought for the purpose of having a judicial determination of that fact, and for the further purpose of having its affairs administered in accordance with the statutory law especially made applicable to the situation. In the application it was stated that the district judge before whom the case was pending had construed the order previously issued by this court as preventing further proceedings in that action; and the majority of this court, which is the same majority that has joined in the principal opinion herein, declined to place an interpretation upon its previous order that would permit the attorney general to exercise his statutory authority to prosecute the action referred to in district court. Later, another application was made by the attorney general for a modification of the order that would permit him to retain certain documents which he represented to be material as evidence in criminal proceedings against officers of the bank. This request was also denied by the majority, the minority considering that reasonable provision should be made to secure for the state the benefits, if any, of such original evidence. On the return day the defendants requested an opportunity to examine witnesses in case the court should be desirous of passing upon the solvency or insolvency of the bank and the merits of the controversy. The case already stood at issue, both upon a motion to quash for lack of jurisdiction and upon an answer putting in issue all the principal facts alleged in the complaint. But at the close of the argument, instead of granting this request, the court entered an order permitting the respondent to file affidavits upon any matters concerning which they desired to submit proof up until October 23d. It was understood by the court that this order should not be construed as either a denial or a granting of the request of the respondents made at the time of argument; but that such request should be dealt with in the future in

the light of such facts as might be developed by the affidavits filed, and as the need for further proof might appear to this court. As is stated by the majority no additional affidavits were filed by the respondents. But on October 21st the attorney general petitioned for a modification of the order entered on the day of argument which would permit him to examine witnesses that he might subpœna to appear before a district court. The petition practically amounted to a renewal of the request made upon argument, and it was based upon the representation that there were some five or six persons whose testimony under oath was material and who had refused to give affidavits. While this petition was pending before it, the court, acting by the majority members, considered the proofs closed, and proceeded to determine the merits of the controversy in the manner indicated in the majority opinion. These facts are not stated in the majority opinion, and I state them as preliminary to the expression of the reasons for dissenting in order that the basis for the dissent may be clear. I dissent from the majority opinion and from the ultimate disposition of this case upon the grounds: First and secondarily, of lack of original jurisdiction in this court, and second and primarily, on the ground of the improper method of conducting the trial; or, to speak more accurately, *upon the ground that no trial has been had*. I shall present my views of these questions in the logical order, though it be in the inverse order of their importance.

*Jurisdiction.*—There are no allegations of fact in the complaint which show that the questions involved concern the governmental franchise of the state or the liberties of its people. It is stated that there was on deposit in the bank over $100,000 belonging to the Agricultural College of the state, and that the state guaranty fund would be affected if the receiver should be permitted to dissipate the funds of the bank; that Halldorson's appointment as receiver was without legal authority, and that the defendants were usurping the powers and responsibilities of the public examiner. These are all the allegations in the complaint that afford any basis for the exercise of original jurisdiction. There are other allegations which are intended to invoke the equity powers of the court; such, for instance, as the allegations respecting irreparable injury. In the majority opinion these allegations are all mingled, and it is made to appear that, unless the equity powers of this particular

court are exercised in the manner prayed for, an injury of great concern to a large number of people will result. There is no apparent reason for assuming that any court of general jurisdiction would act contrary to the equities of the case. Now I do not understand it to be the law of this state or of any other state, where the Constitution vests the supreme court with only appellate and superintending jurisdiction and power to protect the governmental franchise by the issuance of prerogative writs, that all suits capable of being adjudicated by injunctive relief can be brought in the supreme court merely because there may be a large number of persons interested in the result, or because irreparable injury might result from the failure of prompt judicial action.

These may be the very considerations which induce a court of original equity jurisdiction to act in any case, and to grant a temporary injunction to prevent threatened irreparable injury, but they certainly do not afford a reason for interference by a court whose original jurisdiction is limited to superintending control, and prerogative causes. Re Court of Honor, 109 Wis. 625, 85 N. W. 497. Should any district court fail to properly safeguard the subject of litigation by appropriate restraining orders, an appeal could be promptly taken from its orders refusing relief, which appeal would be speedily determined in this court. Sections 7528 to 7536 inclusive and §§ 7833 and 7841, Comp. Laws of 1913. It should be perfectly plain that the interest of the state as a mere property owner is not a ground for original jurisdiction. If it were, why would the legislature expressly provide for suits against the state in the district court of Burleigh county, or where the property is situated? Comp. Laws 1913, § 8175.

Every justice of the peace, every county court of increased jurisdiction, and every district judge in the state, is constantly deciding matters which are of more or less interest to the state as a whole, and which call for the application of laws designed to protect the public welfare. There may be as much general interest, upon occasion, in the result of a coroner's inquest as in a decision of this court upon a grave constitutional matter. A cause does not appeal to the original jurisdiction of this court merely because of the general interest in the decision of the issues presented, or on account of its significance from any other than the strictly governmental standpoint. But when the state is prevented by the acts of private individuals from controlling its own insti-

tutions through its own officers, selected according to law, its governmental franchise is involved. State ex rel. Moore v. Archibald, 5 N. D. 359, 66 N. W. 234. Or when a department, which is vested with the exercise of an important power of the state to govern in certain matters, is paralyzed because of the action of other officers of the state who threaten in fact to prevent the legal exercise of the governing franchise, this court may prevent the threats from becoming effective by compelling the performance of those ministerial duties upon which depends the operation of the governmental franchise through such department. See State ex rel. Birdzell v. Jorgenson, 25 N. D. 539, 49 L.R.A. (N.S.) 67, 142 N. W. 450.

The case just referred to does not hold, as the majority have indicated, that a request for the salary of a public officer presents a proper appeal to the original jurisdiction of this court, and one reading the case is at loss to understand how the majority could have gained such an impression; certainly the allegations showing the effect of the threatened action upon a department of government were fully set forth there, as they are not in the instant case. It would serve no good purpose in this dissenting opinion to refer at length to cases where original jurisdiction was not exercised. Among such may be cited: State v. Nelson County, 1 N. D. 88–101, 8 L.R.A. 283, 26 Am. St. Rep. 609, 45 N. W. 33; State ex rel. Byrne v. Wilcox, 11 N. D. 329, 91 N. W. 955; State ex rel. Walker v. McLean County, 11 N. D. 356, 92 N. W. 385; Duluth Elevator Co. v. White, 11 N. D. 534, 90 N. W. 12; State ex rel. McDonald v. Holmes, 16 N. D. 457, 114 N. W. 367; State ex rel. Madderson v. Nohle, 16 N. D. 168, 125 Am. St. Rep. 628, 112 N. W. 141; State ex rel. Miller v. Norton, 20 N. D. 180, 127 N. W. 717.

Reference to the foregoing cases will disclose that this court has consistently refused to exercise its original jurisdiction through prerogative writ where the questions presented involved merely the private rights of relators or applicants, or where the subject-matter was of local, municipal, as distinguished from general governmental, interest. It appears that in such cases jurisdiction is declined even though the case be one calling for the interpretation of some ambiguous provision of a state law in which a large number of persons are interested. The above cases establish beyond peradventure the proposition that the pre-

rogative jurisdiction of this court is never properly invoked except where the franchise of government is itself *directly* involved.

Of the allegations in support of jurisdiction the only one which, in my judgment, tends in the least degree to support it is that with reference to the usurpation of the powers of the public examiner by the banking board. This may perhaps be thought to involve the governmental franchise of the state in that it concerns the prerogatives of an office created by the legislature for the protection of the public. But assuming that this allegation does present a sufficient cause for original jurisdiction, it does not follow that this court should make of that jurisdictional fact a dragnet to draw to it the entire controversy. It could readily determine the jurisdictional matter, and the cause would remain for trial on the other features if the plaintiffs should desire to press the same before the district court. In other words, if it should be determined that the banking board had no authority to appoint a receiver, then the possession by the public examiner is in every way legal; but if it were determined that the banking board had authority to appoint a receiver, then there would remain for consideration the question as to who ought to have possession of the bank pending the determination of the further issues raised by the allegations on one side of official misconduct by the banking board, the condition of the bank, etc., and the denial of the other. Upon such issues the final judgment in the case would necessarily be based. After the determination of the preliminary jurisdictional question, then the case resolves to one involving merely private rights, and it should be dealt with accordingly.

Under an identical constitutional provision the supreme court of Wisconsin has had occasion to consider this question, and, both in a *per curiam* opinion and in an opinion by Mr. Justice Winslow, have held that they will not go further than to decide the questions that do affect the prerogatives of the state. In the *per curiam* opinion it was said (129 Wis. page 672): "Serious questions as to the construction of the primary law and the duties of executive officers thereunder may properly be considered as questions affecting the prerogatives of the state and the liberties of the whole people, and on that account this court may properly consider them in the exercise of its original jurisdiction, because the decision of such questions necessarily prescribes a

46 N. D.—32.

rule of conduct for all election officers in the state, though the case in which they arise may affect only the nomination for a local office. . . . In the Rinder Case the question whether the certificate issued to Rinder or the one afterwards issued to Packard by the canvassing board is controlling upon the county clerk in printing the ballots is considered a question within the original jurisdiction of this court; but this court will not go into the question as to which candidate received the most votes either by counting the ballots or by taking other testimony." In Judge Winslow's opinion in the same case, at a later stage of the proceedings, it was explained that (page 677), "if original jurisdiction were to be assumed for this purpose, the question then presented itself whether the question as to whether Rinder or Packard actually received the more votes, though a mere local controversy, should not be also entertained and decided as ancillary to the main question. The proposed action was an action in equity, and the proposed complaint alleged that Rinder in fact received the greater number of votes. This allegation might well be put in issue. No reason was perceived why, if the action were allowed to proceed as an action in equity, Packard should not be interpleaded for his own protection, and be entitled to plead and prove that he himself received the greater number of votes, and thus convert the action substantially into an election contest over a nomination for a local office. If this were to be done for one, it should be done for all in a similar situation, and thus the court would in effect become a tribunal for the settlement of all contests over primary nominations for all offices, state or local, or, in other words, an appellate canvassing board for the entire state." Then follows an explanation as to why the court declined to entertain the proposed equity action but did direct the issuance of an alternative writ of mandamus. It decided only the question upon which jurisdiction was based. State ex rel. Rinder v. Goff, 129 Wis. 668, 672, 677, 9 L.R.A.(N.S.) 916, 109 N. W. 628.

I am satisfied that the wiser course is that indicated in the Wisconsin case cited. It would enable this court to determine questions which are in fact *publici juris,* without the complications arising out of litigation in which private rights are vitally concerned; and it would properly relieve an appellate court of the necessity for determining, originally, questions of fact except such as may be necessary to a deci-

sion of questions of public importance involving the governmental franchise. Furthermore it would be more consistent with the spirit of the constitutional provision which precludes jury trials in this court, and which authorizes this court to send questions of fact to the district court for trial. N. D. Const. § 87.

In another Wisconsin case in which the prior decisions of that court —and there are many—relating to the question of jurisdiction were reviewed (State ex rel. Bolens v. Frear, 148 Wis. 456, L.R.A.1915B, 569, 134 N. W. 673, 135 N. W. 164, Ann. Cas. 1913A, 1147), certain general propositions for which the decided cases are thought to stand are stated. Among the negative propositions said to be established is this: "(2) A case involving a mere private interest, or one whose primary interest is to redress a private wrong, will not be entertained." There can be little doubt upon the record before this court in the present case, that the primary purpose of this action is to redress a private wrong, and that it falls directly within the class which the above authority says will not be entertained. It will be noticed that the judgment here provides even for the taxation of costs in favor of the so-called relators, thus recognizing the private character of the litigation.

The majority have adopted a peculiar style of reasoning upon this question. A number of cases are cited which were decided by this court upon original application of suitors; such, for instance, as cases involving the constitutionality of laws or the propriety of a given course of ministerial official conduct, generally involving questions of statutory construction. It is, of course, well known to the majority that applications are frequently made to this court where the members have the gravest doubt as to whether the controversy justifies its interposition by prerogative writ, and that in such cases it has become the custom to reserve all questions of jurisdiction. And they are also familiar with the further fact that in the great majority of such cases opposing parties and counsel were equally interested in obtaining a decision of the questions involved, and realized that, until decided by the opinion of this court, there could be so satisfactory determination of the matter. In such situations the cases are of no importance whatever as precedents for the proper exercise of original jurisdiction. But, on the contrary, they may and do represent only the extent to which this court will go in the interest of practical expediency. The majority

know full well that, in several of these cases which are cited as precedents, the deliberate judgment of the court has been that the case did not present a proper appeal to the original jurisdiction of this court, because involving no question *publici juris* in any proper sense. Judicial expediency at once gives way when a party comes in relying upon the constitutional delegation of original jurisdiction to the district courts. In no case cited, and, I confidently assert, in none that can be found, has a court of appellate, superintending, and prerogative jurisdiction, only, interfered at the instance of private suitors to change an existing statute *ex parte,* and prevent executive officers of the state from performing what they conceive to be their official duties under the statutes.

Respectful deference to the views of the majority on the question of jurisdiction, however, requires a further discussion of the interpretation of the statute (chapter 53 of the Laws of 1915), which give rise to the alleged conflict of authority between the banking board and the public examiner. I have no desire to treat this case as turning upon any view as to jurisdiction merely, but in so far, under my views of the case, as the other questions may properly be considered, I deem it a duty to express an opinion. The matter is here for determination. The issue now in hand is one of law.

I have not the least doubt that the banking board, under our statutes, has authority to appoint a receiver for a bank, who, when appointed, may hold possession of the bank until he is succeeded by a receiver appointed by a court or removed by the authority that appoints him. I disagree entirely with the majority in the construction of chapter 53 of the Session Laws of 1915, wherein they hold that chapter to repeal by implication those provisions of §§ 5146 and 5183, Compiled Laws of 1913, which specifically authorize the banking board to appoint receivers. Chapter 53 of the Session Laws of 1915 only purports to amend one section of the Compiled Laws, and that is § 5189, which defines insolvency. In the amendment the definition of insolvency is in no way changed, but additions are made to the section with respect to the procedure upon insolvency. For instance, immediately after the definition, it is provided, "But its property shall not be subject to attachment or levy, nor shall a receiver be appointed during such reasonable time as the state examiner may require for examination." This

limitation does not apply in the instant case, for the reason that the receiver was not appointed during any reasonable time required for the examination, but after the examination, such as it was, had been completed. Furthermore, the very language of the limitation implies the existence of a power outside the examiner to appoint. This is the power that is not to be exercised during the time he requires for examination. In the following sentence it is provided that if, after the examination, the examiner shall deem best, he shall, *with the approval of the state banking board,* appoint a receiver, who shall take possession," etc. This clearly does not indicate a desire on the part of the legislature to supplant the appointing power of the state banking board with only an optional power in the state examiner. It will be noted that all the discretion the state examiner has in such matters is to be exercised *with the approval* of the banking board. If he is precluded from coming to an independent decision regarding the appointment of a receiver, is it reasonable to suppose that his nonaction was intended to detract from the power expressly given to the banking board in other sections of the Code? If the views of the majority are correct, the legislature has said to the examiner: "If you conclude not to appoint a receiver your determination is final, but if you decide to appoint one you must appeal to the banking board and first obtain their approval." And the only reason for concluding that the examiner's negative determination is final is the giving of the subordinate, conditional authority. The reasonable construction, as I view the statutes, is that the banking board has the same authority with regard to the appointing of receivers as was previously vested in it by the two sections referred to, except that it cannot be exercised during such reasonable time as the examiner may require for examination. And, at the conclusion of the examination, the examiner may appoint a receiver with the approval of the banking board, or the banking board itself may appoint one under § 5183 or § 5146. It seems to me that the whole theory of the regulatory statutes is ignored by the majority. The statutes throughout make the banking board the responsible regulating agency. The Act of 1915 fully recognizes this in subordinating the examiner's powers of appointment to the will of the board. I confess my inability to follow the reasoning of the majority in support of the repeal by implication of §§ 5146 and 5183, though their construction is said to be so

plain that "he who runs may read." The foregoing is not to be taken as an expression of approval of the action taken by the banking board in this case. That question, as will presently appear, hinges on the determination of questions of fact, which cannot, in my judgment, be determined with any degree of propriety upon the record now before this court.

*Denial of judicial due process.*—The question of transcendent importance in this case is not the question of jurisdiction, or the related matter of the construction of the statute. This case has been heard upon affidavits, merely; and that over the protest of defendants who were all the time insisting upon their constitutional right to a trial according to due process of law, before the rendition of a final judgment. But the majority denied the requests, considered the case submitted, and proceeded to render a final judgment involving the decision of the issues of fact. Compared to a denial of judicial due process, all other questions are as chaff to the wheat. It seems to me that this proceeding is most extraordinary. I have searched in vain for and precedent for such action. My researches have failed to bring to light any case where a court of last resort has held to be proper the rendition of a final judgment based upon a trial by affidavit had upon the return of an order to show cause. On the contrary, it appears that the very few times such proceedings have found their way to appellate courts they have been promptly held to be erroneous. Collins v. Carr, 112 Ga. 868, 38 S. E. 346; Chicago, P. & St. L. R. Co. v. St. Louis, P. & N. R. Co. 79 Ill. App. 384; Weaver v. Toney, 107 Ky. 419, 50 L.R.A. 105, 54 S. W. 732; State v. Booth, 28 La. Ann. 726; Whitehurst v. Green, 69 N. C. 131; Jackson v. Bunnell, 113 N. Y. 216, 21 N. E. 79; Gross v. Wieand, 151 Pa. 639, 25 Atl. 50; Hornesby v. Burdell, 9 S. C. 303; Adams v. Crittenden, 4 Woods, 618, 17 Fed. 42; Day v. Snee, 3 Ves. & B. 170, 35 Eng. Reprint, 443; 22 Cyc. 952. High, Inj. § 1591, says there is no precedent for granting a permanent injunction on affidavits. His statement seems to be amply warranted, but it must now be qualified.

The following quotations taken from the cases cited will illustrate the soundness of the foundation upon which this dissent is based. The supreme court of North Carolina in the Whitehurst Case, supra, says:

"Making an order, decree, or judgment, by whatever name it may be

called, for a perpetual injunction against issuing an execution on a judgment at law, heard upon a motion and affidavits, is a proceeding without precedent in the annals of the judicial procedure in any court claiming an English original. . . .

"Our surprise that the learned judge should have granted a perpetual injunction on motions and affidavits, is only equaled by our surprise that the learned counsel should have made the motion.

". . . It may be that the order for a perpetual injunction meets the merits of the case, but that cannot warrant a departure from all forms and precedent, either under the old or the new mode of procedure."

In Gross v. Wieand, 151 Pa. 639, 25 Atl. 50, the supreme court of Pennsylvania, in speaking of the procedure in the case where the trial court, upon application for preliminary injunction, had considered the cause submitted and made a final decree on the merits in favor of the plaintiff, said (page 646):

"Of course it was premature to decide the case as upon final hearing, and to grant the permanent relief prayed for in the bill, upon such a state of the pleadings and in such a condition of the proofs.

In Hornesby v. Burdell, 9 S. C. 303, the court said (page 307):

"While it is undoubtedly true that a circuit judge may, in a case of which he has jurisdiction, upon a proper showing, grant an interlocutory or temporary injunction, at chambers, to continue until the final hearing of the case on its merits, it is very clear that a perpetual injunction cannot be granted until the case is fully heard upon its merits and the issues raised determined by the tribunal having authority to make such determination."

Mr. Justice Wright, in the Illinois case cited (79 Ill. App. at page 385), says:

"Where issues of fact are formed in the case, it is the right of the parties, unless waived, to have the evidence heard, either by deposition or orally, in open court, and thus be secured in the right of cross-examination of the witnesses. . . . This cause not having been submitted to be heard on the merits, the court was not permitted to and did not enter a final decree."

In Federal court case (Adam v. Crittenden, 4 Woods, 618, 17 Fed. 42), it is said (page 44):

"So that it may be considered that up to the final decree all the parties and the judge himself held and treated the first injunction as temporary only. The terms of the injunction are to that purport. At the first hearing it does not appear that any evidence was taken or considered. It was neither regular nor proper to have issued a perpetual injunction at that stage of the case."

Of course if it is proper practice to determine the merits of an injunction suit in this court by proof limited, over the protest of one of the parties, to affidavits, it would clearly be the proper practice in the district courts. A parallel, hypothetical case may serve to emphasize the erroneous character of this practice. (Both parties, of course, have recourse to the same remedies and practice.) Suppose that in the matter in question here the governor, acting as chief executive and member of the banking board, had instructed the bank examiner to take charge of the bank, and that the other members of the banking board had, upon the examiner's report, deemed it proper to appoint a receiver, who, when appointed, was refused admission to the bank by the examiner acting upon instructions from the governor. Assume an action to have been begun in district court to restrain the examiner from interfering with the attempt of the purported receiver to obtain possession of the bank, followed by the issuance of a preliminary injunction and a hearing upon affidavits, only, upon the return day of the order to show cause. The matter stands at issue on questions of fact, and the examiner (who has already been ousted by preliminary injunctional order), requests a trial. The district judge tells him he may file some affidavits instead, and then, in the course of a few days, enters a judgment permanently enjoining him. Perhaps the majority of this court would be prepared to say that a trial so limited is consistent with due process. I must confess I scarcely think so. The authorities above cited speak with one voice against it. But yet such is the practice sanctioned in this case.

To my mind, the error is fundamental and far reaching. It strikes at the very foundation of judicial due process of law. Can it fairly be said that a hearing at which no witnesses were sworn in open court on behalf of the plaintiffs, at which no opportunity was afforded for cross-examination of the persons whose *ex parte* affidavits the court takes as proof of the facts alleged in the complaint, and at which the defendants

are denied the privilege of subpœnaing witnesses in their behalf, is consistent with the law of the land, as mentioned in Magna Charta, and which, with us, is commonly expressed as the law that "hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial?"

I am sure that this court would not hesitate to condemn the exercise of arbitrary power by the other departments of government, and this fact affords a weighty reason why it should not transgress beneficent constitutional safeguards. Justice White, now Chief Justice, of the United States Supreme Court, has given expression to the seriousness of the question in a way that surpasses other attempts that might be made in the same direction. In the case of Hovey v. Elliott, 167 U. S. 409, 42 L. ed. 215, 17 Sup. Ct. Rep. 841, it was held that due process gives even the defendant in a contempt proceeding the right to be heard in his defense, and that the court had no power, as a punishment for contempt, to refuse the person in contempt the right to defend the main case upon the merits. In the course of his opinion, he said (pages 417, 418):

"Can it be doubted that due process of law signifies a right to be heard in one's defense? If the legislative department of the government were to enact a statute conferring the right to condemn the citizen without any opportunity whatever of being heard, would it be pretended that such an enactment would not be violative to the Constitution? If this be true, as it undoubtedly is, how can it be said that the judicial department, the source and fountain of justice itself, has yet the authority to render lawful that which, if done under express legislative sanction, would be violative of the Constitution? If such power obtains, then the judicial department of the government sitting to uphold and enforce the Constitution is the only one possessing a power to disregard it. If such authority exists, then, in consequence of their establishment to compel obedience to law and to enforce justice, courts possess the right to inflict the very wrongs which they were created to prevent."

Cooley on his work on Constitutional Limitations, 7th ed., has said (page 526):

"In judicial investigations the law of the land requires an opportunity for a trial; and there can be no trial if only one party is suf-

fered to produce his proofs. The most formal conveyance may be a fraud or a forgery; public officers may connive with rogues to rob the citizen of his property; witnesses may testify or officers certify falsely, and records may be collusively manufactured for dishonest purposes; and that legislation which would preclude the fraud or wrong being shown, and deprive the party wronged of all remedy, has no justification in the principles of natural justice or of constitutional law."

And certainly what the legislature cannot do in contravention of judicial due process does not become legal, constitutional, or just when done by a court.

In recognition of the salutary constitutional requirement of due process, be it said that the legislature, in so far as it has spoken upon the practice in connection with injunction and the order to show cause, has made provision in every way consistent with the full enjoyment of the constitutional rights of suitors. Code Civ. Proc. art. 3. In §§ 7528–7536, Compiled Laws of 1913, ample provision is made for the issuance of preliminary injunctions upon affidavits, and for a subsequent hearing, also upon affidavit, upon motion to vacate. Counter affidavits are also allowed. But it is expressly provided (§ 7530) that a period longer than six months must not be allowed to elapse *"before the hearing of the merits of the case shall be had for the purpose of deciding the question as to the justice or necessity of making the temporary restraining order permanent."* It is too elementary to require discussion that, where issues of fact are joined in an equity action praying for a permanent injunction, the hearing of the merits involves the trial of the facts in the ordinary manner. The only hearing that there can be upon the order to show cause in such matter (Comp. Laws 1913, § 7533) is a hearing upon the question of the temporary injunction, and this may be upon affidavit. The legislature has not attempted to prescribe any new or different mode of trial applicable to an injunction suit than that which originally obtained. This court should not lend its sanction to a mode of trial that could not constitutionally be prescribed by the legislature.

The issues in the case were important. We know not what the evidence might have been. No emergency can justify the denial of a trial in a court of justice. If an exigency arises, final judgment might better be suspended than rendered upon insufficient hearing. I can con-

ceive of no judicial function calling for greater delicacy in its exercise than passing judgment upon the good faith, the motives, or even the wisdom (if this is ever permissible) of executive officers in the exercise of executive or quasijudicial powers, and, speaking for myself, I shall positively refuse to do so except after a full hearing at which opportunity shall be given to swear and examine witnesses in their behalf, and to cross-examine the opposing witnesses. A man who puts the state upon proof of the commission by him of the slightest offense has this constitutional measure of protection, and I know of no reason why it should be denied officers elected by the people, who are accused of the grave offense of wilful and wanton breach of official duty. It is no answer to say that a trial of the very issues raised by the complaint and the answer might, of itself, have the effect of inflicting irreparable injury upon the plaintiffs. If considerations of this character are once made controlling to the extent of precluding trials, then government by injunction will become the accepted rule, instead of the odious exception. To dispose of this case without trial, on the supposition that a trial itself would deprive the plaintiffs of the benefit of a favorable decision, if one were ultimately reached, is of course to prejudge the entire merits of the controversy, or rather to dispose of the case as though the merits lay all on one side, and this without a full inquiry as to whether such be the law and the fact. Courts of·equity have exceedingly broad powers and flexible remedies for conserving any subject-matter in litigation before them. This should make them all the more reluctant to judge of the merits of a controversy without the fullest opportunity for a hearing.

Perhaps the defendants merit the censure expressed by the majority; perhaps they have been guilty of the matters found against them; but I cannot find it in my conscience to say so judicially in the absence of a trial conducted according to the principles of Anglo-Saxon jurisprudence.

So far as the plaintiffs are concerned, it is to be hoped that the condition of the bank is such as to justify the reopening which closely followed the announcement of the majority opinion. Possibly an immediate trial on the merits might have given added assurance to the correctness of findings which are now based on a showing only sufficient for a prima facie case required for a temporary injunction.

Viewing the matter as I do, I can only regard the final judgment as being void for lack of a trial conducted in accordance with due process of law. The final judgment should be set aside, and the case should either be held in abeyance upon proper application or referred to a district court for trial on the merits.

CHRISTIANSON, Ch. J., concurs.

Filed December 6, 1922.

BIRDZELL, J. (dissenting further). Since the foregoing opinion was written, the writer of the original majority opinion has deemed it necessary to supplement his opinion at some length. The supplement, like the original opinion, it seems to me, largely evidences its own error; but there are some statements in it regarding the procedure which might be thought to disagree with some statements in the foregoing dissenting opinion. I deem it proper, therefore, to restate some of the facts, as they may conduce to a more accurate understanding. It is stated by Judge Bronson: "In this regard, however, the respondents in this case had full opportunity to take evidence, and full opportunity to orally examine and orally cross-examine all witnesses that they might have desired to produce." It is stated in the original opinion that "pursuant to the order of this court, the parties have been granted until October 23, 1919, to make up and complete the record in this matter." If these two statements be linked together, it might readily appear that full opportunity was accorded for a hearing, but such is not the fact. The order entered on the day of argument is not as stated in the majority opinion. Nothing is said in the order as to any time limit for *completing* the record, nor does the order relate to the *completion* of the record at all. It only provides for the submission of additional affidavits if either party should desire to do so, and, as stated in the foregoing dissenting opinion, it was distinctly understood by the members of this court that, in entering the order referred to, it should not be considered as denying the application of the attorney general, requesting an opportunity to cross-examine witnesses and submit testimony in case the court entertained jurisdiction and determined to go into the controversy of its merits; and that such request should be dealt with in the future in the light of such facts as might be developed by the affidavits filed. The case was never set down for hear-

ing upon the merits at all. The only hearing conducted was upon the order to show cause, and the matter has never, at any time, been heard on its merits in this court or any other court, or before any referee. Neither was it ever set down for any such hearing. Just before the majority opinion was filed the last request of the attorney general for a hearing was denied by the majority.

Obviously, then, it is idle to talk of an opportunity for a hearing and for taking depositions. Until this court should take some definite action upon the application of the attorney general, it could not even be known by that officer before what court the hearing would be had, as this court has authority to refer questions of fact to a district court for trial (Const. § 87). Consequently, he could not know whether or not the witnesses whose testimony he desired could be present, or whether it would be either necessary or permissible for him to resort to depositions. Until the attorney general knows before what court the facts are to be tried, how can he know what witnesses can be compelled to respond to subpœnas (Comp. Laws 1913, § 7876) ? or in what instances depositions may be resorted to, as the latter are only admissible in the instances provided by statute (§ 7889) ? Furthermore, until that action were made known, how could the defendants be assured of an opportunity to cross-examine the witnesses whose affidavits the majority considers proof ? Subpœnas by statute (§ 7873) are required to apprise the witnesses of the particular time and place that they are required to attend. Pray tell, at what time and place a witness could have been subpœnaed to enlighten the supreme court of the state of North Dakota upon the issues of fact in this case, when the defendant's request for a hearing was not definitely acted upon until the filing of an opinion disposing of the case upon the merits of the very issues to be tried, and when and where would the majority have had the witnesses appear ? They have never said. Perhaps the attorney general was remiss; perhaps he should have anticipated that this illegal procedure would be indulged in. But I prefer to think that he was rather justified in assuming that the procedure universally recognized as constitutional and proper would be observed.

It is suggested that the method of taking testimony by affidavit is recognized by § 7883, and the broad intimation is that the affidavits, then, were necessarily evidence in a legal sense in this case. Just four

sections removed from the section cited, § 7887, expressly limits the use of affidavits by providing that they may be used "to verify a pleading, to prove the service of a summons, notice, or other process in an action, to obtain a *provisional* (not final) remedy, an examination of a witness, a stay of proceedings, or upon a motion and in any other case permitted by law." The majority, of course, are unable to support a trial by affidavits as being permitted by any law existing outside the majority opinion in this case, and it is perfectly obvious that the legislature does not recognize the use of an affidavit as proof sufficient to support a final judgment in a case where issues of fact are joined.

In view of the criticism for not having fully expressed the foregoing dissenting views in conference, it may not be improper to review the manner in which the decision was reached and announced. The lengthy and exhaustive majority opinion, prepared by Mr. Justice Bronson, was circulated on the evening of October 23d, at the conclusion of a day upon which oral arguments had been heard in three causes. The following day, after the hearing of oral arguments in three causes, and in the latter part of the afternoon, a conference was called at the suggestion of the writer of that opinion. The time between the argument of this case on the return day, October 15th, and October 23d, which was the last day set for the filing of additional affidavits, had been largely consumed in the hearing of causes. It will thus be seen that very little time was available within which to give judicial consideration to this matter. But at the time of the conference I was of the opinion that it was improper to dispose of the case in the manner indicated in the majority opinion, and the dissent then announced amply indicated that fact. The views of the dissenting members on the jurisdictional question were already well known to the majority, and on the question of the hearing the dissenting members at the same conference voted against the denial of the attorney general's application. If the majority members of the court cared for a more adequate expression of the reasons leading to that dissent, they might readily have secured this advantage, if advantage it be, by waiting a few days before filing the opinion. Up to that time only twenty-four hours had elapsed since the expiration of the time for filing affidavits, and, under the preliminary order issued, the bank was in the possession of the same parties who were entitled to continue in possession under the majority opinion.

So it is apparent that no great damage could have resulted from the taking of a little time to give judicial consideration to the views of every member of the court before the filing of opinions. Whatever credit attaches to the prompt despatch of the decision in this case the majority is entitled to receive. Indulgence, however, for one week or less would have given them the full benefit of the foregoing dissenting views.

The foregoing statement is not written to provoke further controversy nor as an extension of the dissenting opinion, already perhaps too long. It is written solely for the purpose of presenting in a more detailed way than originally deemed necessary some of the facts in this case.

## Filed November 22, 1919.

CHRISTIANSON, Ch. J. (dissenting). I concur fully in the excellent opinion prepared by Mr. Justice Birdzell. He has covered some of the matter so fully that little can be added. Hence, I shall not endeavor to cover all the aspects of the case with the same detail I should otherwise have felt obliged to do; and what I shall say will, in a measure, be supplementary to what is said in that opinion.

On October 7, 1919, there was presented to this court an application for an original writ. The application was dated and verified on that day. The majority members voted that the application be granted, and on the day following there was issued out of this court an alternative writ returnable October 15, 1919. The writ, among other things, provided: "That in the meantime, and until the further order of the court:

"The defendants and respondents, each and all of them, are hereby enjoined and restrained and prohibited from exercising the powers and prerogatives of relator Lofthus, and from further interference with the possession of said bank, its assets, and business; and that pending this case the defendants relinquish to the state examiner possession of the bank and all its securities, and the state examiner shall have control of the bank until the further order of the court, and that either party be permitted to examine the records of the bank for the purpose of preparing and ascertaining facts material to this proceeding.

"That the defendant and respondent Halldorson is enjoined, restrained, and prohibited from exercising any right, privilege, or author-

ity-as such pretended receiver, or otherwise, over the business, assets, and control of said bank.

"That the said banking board of the state of North Dakota, or the members thereof, are enjoined and restrained and prohibited from invalidating postdated checks as collateral security; and

"That said defendants and respondents are hereby enjoined and restrained from further continuance of their unlawful acts and. interferences in this petition complained of."

The application for the writ was not verified by any of the relators, but was verified by one of the relators' attorneys, on information and belief. The application was accompanied by affidavits of the directors of the Scandinavian American Bank, and the affidavits of Thatcher, Strom, and Friedman. Thatcher's affidavit gives his views as an expert accountant as to the standing of the bank, and the collectability of the postdated checks held by it as collateral security for some of its loans. The affidavit of Strom is to the effect that he had handled many thousands of dollars worth of postdated checks made payable to the Nonpartisan League, and "that of such checks made by persons residing in North Dakota ultimately 85 per cent are paid in full." The affidavit also sets out a telegram to The Courier News, signed by fifteen persons, who state they are League members in McKenzie county, and pledge themselves that "their post dated checks, when due, will be worth. par, which is more than are Liberty bonds on the Wall street market." Friedman's affidavit is to the effect that he is a depositor in the Scandinavian American Bank, that on October 2d, he had a conversation with Halldorson, the then acting receiver of the bank, wherein he says that Halldorson stated, in reply to questions propounded by Friedman, that the bank might never reopen, and that it might take two or three years before the depositors received all of their money. These were the papers upon which the court assumed jurisdiction and directed that the writ issue. The moving papers were not accompanied by any affidavit made by any officer of the state; not only was there no affidavit by the relator Lofthus, but it was stated that he was out of the state at the time the bank was closed, and had not yet returned. In these circumstances, and upon the showing mentioned, this court issued its unprecedented writ against a board consisting of elective, constitutional officials of this state. The writ was issued without notice, al-

though the principal respondents maintain their offices in the same buildings where this court transacts its business.

The first question which naturally presented itself upon the presentation of the application was that of jurisdiction. I was of the opinion then that the application failed to present a prima facie case for the exercise of original jurisdiction by this court. That opinion has not been weakened, but strengthened, by subsequent consideration.

It has been said by one of the majority members that "the supreme court is supreme. It has jurisdiction over all courts, state banking boards, and all such administrative boards, and it may say to each of them thus far shalt thou go, and no further." This appears to be a very easy and happy disposition of the question of jurisdiction, and is perhaps the best of which the case admits. But the statement is based upon an erroneous premise. The supreme court is supreme only in the sense and to the extent the Constitution has said it shall be supreme, and not otherwise. The court is a creature of the Constitution, and its powers are fixed thereby. The Constitution distributes the powers of government among three separate co-ordinate departments—the legislative, executive, and judicial. The supreme court is invested with judicial power only, and it and the judges thereof are, by express declaration, precluded from performing any duties except as are judicial. Const. § 86. The people by their Constitution sought to insure in this state a tribunal of dignified impartiality to sit as final interpreter of the laws of the state. To that end they not only precluded the court and the judges thereof from exercising executive and legislative duties, but said that a member of this court should be ineligible to any other than a judicial office "during the term for which he was elected or appointed such judge." Const. § 119.

Nor does the Constitution confer unlimited judicial power upon the supreme court. The power with which it is vested is consonant with the place which the court was intended to occupy in the scheme of our state government. The primary function of the supreme court is that of an appellate court of last resort. It is not invested with original jurisdiction in ordinary causes. Such jurisdiction is vested in the district courts.

The Constitution provides: "The district courts shall have original

46 N. D.—33.

jurisdiction, except as otherwise provided in the Constitution, of all causes both at law and equity." And "they and the judges thereof shall also have jurisdiction and power to issue writs of habeas corpus, quo warranto, certiorari, injunction, and other original and remedial writs, with authority to hear and determine the same." Const. § 103.

*The supreme court,* except as otherwise provided in this Constitution, *shall have appellate jurisdiction only,* which shall be coextensive with the state, and shall have a general superintending control over all inferior courts under such regulations and limitations as may be prescribed by law. Const. § 86.

The powers of the supreme court, in addition to those granted by § 86 of the Constitution, are those granted by § 87 thereof, which latter section reads: "It shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction, and such other original and remedial writs as may be necessary to the proper exercise of its jurisdiction, and shall have authority to hear and determine the same; provided, however, that no jury trial shall be allowed in said supreme court, but in proper cases questions of fact may be sent by said court to a district court for trial."

It will be observed that these sections vest in this court three independent and distinct grants of jurisdiction: (1) Appellate jurisdiction; (2) general superintending control over inferior courts; and (3) original jurisdiction to issue certain writs, and to hear and determine the proceedings so instituted.

The third grant of jurisdiction, *i. e.,* the original jurisdiction, alone is involved in this proceeding. The extent of such jurisdiction is no longer—if indeed it ever was—an open question in this state. It seems clear, however, that the framers of the Constitution had definitely in mind the purpose and limits of the original jurisdiction which they proposed that the people confer upon this court. For a provision substantially the same in the Wisconsin Constitution had been fully explained and elucidated in two masterly opinions prepared by Chief Justice Ryan, of the Wisconsin supreme court, a quarter of a century before the North Dakota Constitution was framed. See Atty. Gen. v. Chicago & N. W. R. Co. 35 Wis. 425; Atty. Gen. v. Eau Claire, 37 Wis. 400.

In those cases the Wisconsin supreme court had announced that the

grant of power to the supreme court to issue certain writs was not intended "in the same sense and with the same measure of jurisdiction" as the power granted in the Constitution to the circuit (in this state district) courts to issue the same writs. The court said: "The writs are given to the circuit courts as an appurtenance to their general jurisdiction; to this court for jurisdiction. Those courts take the writs with unlimited original jurisdiction of them, because they have otherwise general original jurisdiction. *Other original jurisdiction is prohibited to this court, and the jurisdiction given by the writs is essentially a limited one.* These courts take the prerogative writs as part of their general jurisdiction, with power to put them to all proper uses. *This court takes the prerogative writs for prerogative jurisdiction, with power to put them only to prerogative uses proper."* The original jurisdiction of this court is not only limited to prerogative writs, but it is confined to prerogative causes." That the prerogative jurisdiction of the court was conferred because "contingencies might arise wherein the prerogatives and franchises of the state, in its sovereign character, might require the interposition of the highest judicial tribunal to preserve them." That the court was given original jurisdiction of certain writs, because they are designed for the very purpose of protecting the sovereignty and its ordained offices from invasion or intrusion, and, also, to nerve its arm to protect its citizens in their liberties, and to guard its prerogatives and franchises against usurpation." That "it is not enough to put in motion the original jurisdiction of this court, that the question is *publici juris;* it should be a question *quod ad statim republicae pertinet;* one affecting the sovereignty of the state, its franchises, or prerogatives, or the liberties of its people." That "to bring a case within the original jurisdiction of this court, it should involve, in some way, the general interests of the state at large."

It would seem that when this state adopted the provision relating to the original jurisdiction, it also adopted the construction which the Wisconsin supreme court had placed thereon. In any event that construction, in the early history of the state, received the approval of both this court and of the legislature. The question of original jurisdiction first arose in state v. Nelson County (decided April 21, 1890) 1 N. D. 88, 8 L.R.A. 283, 26 Am. St. Rep. 609, 45 N. W. 33. In that case it was sought to enjoin the issuance of seed-grain bonds by the de-

fendant county, on the ground that the issuance of such bonds would contravene the Constitution. The court took occasion to point out that the original jurisdicion of the supreme court might be invoked "only in cases *publici juris* and those affecting the sovercignty of the state, its franchises, and prerogatives, or the liberties of its people." It said: "The case at bar affects only the local concern of the county of Nelson and its taxpayers, and hence does not fall within the limited class of cases indicated above, and in which alone this court will assume original jurisdiction." 1 N. D. 101. Attention was also called to the fact that the provision in our Constitution relating to original jurisdiction is substantially the same as the provision in the Wisconsin Constitution on the same subject, and the two Wisconsin cases heretofore referred to were approved. In 1891 the legislative assembly of this state, by enactment, provided that the supreme court "shall exercise the said original jurisdiction only in habeas corpus cases, and in such cases of strictly public concern as involve questions affecting the sovereign rights of the state or its franchise or privileges." Laws 1891, chap. 118; Comp. Laws 1913, § 7339. This statute has never been repealed or amended. The correctness of the rule announced in the Nelson county case, and in the statute mentioned, has never been questioned, but has repeatedly been reaffirmed. As was said by this court, speaking through Chief Justice Morgan, in State ex rel. Steel v. Fabrick, 17 N. D. 532, 536, 117 N. W. 860: "These sections [Const. §§ 86 and 87] have been under consideration in many cases by this court. From these cases it is established without dissent that the jurisdiction is not to be exercised unless the interests of the state are directly affected. Merely private rights are not enough on which to base an application for the issuance of original writs by this court. The rights of the public must appear to be directly affected. The matters to be litigated must not only be *publici juris,* but the sovereignty of the state or its franchises or prerogatives or the liberties of its people must be affected. Before the court will, in the exercise of its original jurisdiction, issue prerogative writs, there must be presented matters of such strictly public concern as involve the sovereign rights of the state, or its franchises or privileges. The often quoted statement of the rule as to the original jurisdiction of the supreme court to issue writs of a prerogative character, as given in Atty. Gen. v. Eau Claire, 37 Wis. 400, is well ex-

pressed and clear; 'To warrant the assertion of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar, perhaps, to some subdivision of the state, but affecting the state at large in some of its prerogatives; raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state in its sovereign character.' This statement of the rule has been approved in many cases in this court."

Is this action one which "affects the sovereignty of the state, its franchises, or privileges, or the liberties of its citizens?" Unless this question can be answered in the affirmative, this court has no jurisdiction, and it is the sworn duty of the members of the court to say so. The court has no discretion. Discretion exists only in cases which fall within the rule stated, but "in cases, not within said rule, no discretion is vested in this court." State ex rel. McDonald v. Holmes, 16 N. D. 457, 114 N. W. 367. The question of jurisdiction is not technical, as has been intimated. It lies at the very foundation of official action. In reality there can be no official or judicial action without it. Where jurisdiction is absent, i. e., where officials exercise powers which have not been conferred upon them, they cease to be agents of the people, and become usurpers. It is at least as much the duty of officials to refrain from exceeding their powers, as to exercise the powers conferred. That is true of all officials. It is peculiarly true of the courts, whose function it is to interpret laws.

The original jurisdiction is a great power. It was vested in this court for use upon prerogative occasions only. It was limited both in scope and purpose,—it was limited to certain writs, "designed for the very purpose of protecting the sovereignty and its ordained offices from invasion or intrusion; to nerve its arm to protect its citizens in their liberties, and to guard its sovereign prerogatives and franchises against usurpation."

The Scandanavian American Bank of Fargo is purely a private business concern. It is owned by its stockholders, and its business affairs conducted by its officers and directors. The profits of its business belong to its stockholders, and its losses must be borne by them. It is not an instrumentality of the state government. It exercises and possesses none of the sovereign power of the state. It performs no govern-

mental function, and is in no sense an adjunct of the state government. It stands in precisely the same position as any other banking corporation, and, if our Constitution still functions, it is subject to the same rules and laws as other institutions of its class. If its rights are invaded, it and its officers are given ample opportunity to obtain protection through the ordinary processes of law provided under our Constitution. So far as the alleged conflict of power between the state examiner and the banking board is concerned, it is limited to this specific controversy. So far as this case is concerned, that controversy is important only as it may affect the rights of the bank. Clearly, it does not affect the sovereign rights of the state. The various decisions cited in the principal majority opinion fall far short of sustaining the views of majority members in this case. And the various reasons advanced for assuming jurisdiction are excuses rather than reasons, and, like excuses generally, they tend to aggravate rather than diminish the very faults they attempt to palliate.

The decision of the majority members that chapter 53, Laws 1915, by implication repeals those provisions of §§ 5146 and 5183, Comp. Laws 1913, which specifically authorized the banking board to appoint receivers of insolvent banks, is, in my opinion, violative of the most elementary and fundamental rules of statutory construction. The purpose and scope of chapter 53 have been so fully considered in Judge Birdzell's opinion that it would be needless repetition to restate them here. The act does not purport to repeal any existing law whatever. Nor does it purport to alter or amend any law relating to the powers or duties of the banking board. The section which the act amends is the one defining insolvency of banks. It is elementary that repeals by implication are not favored. Legislators are presumed to be men of intelligence. It is presumed that laws are passed with some deliberation, and with knowledge of existing laws on the same subject. Chapter 53 was introduced by a banker. Doubtless, at least, he and the members of the legislative committees to whom the measure was conferred, were entirely familiar with the then existing laws. If there had been any intention of curtailing or abrogating the powers of the banking board, the legislature would doubtless have said so expressly. "It is a reasonable presumption that all laws are passed with a knowledge of those already existing, and that the legislature does not intend to repeal

a statute without so declaring." Lewis's Sutherland, Stat. Constr. 2d ed. § 267. "The intention to repeal will not be presumed, nor the effect of repeal admitted, unless the inconsistency is unavoidable, and only to the extent of the repugnance." "A later and an older statute will, if it is possible and reasonable to do so, be always construed together, so as to give effect not only to the distinct parts or provisions of the latter, not inconsistent with the new law, but to give effect to the older law as a whole, subject only to restrictions or modifications of its meaning, when such seems to have been the legislative purpose." "It is the duty of the court to so construe the acts, if possible, that both shall be operative." "There must be such a manifest and total repugnance that the two enactments cannot stand." "One statute is not repugnant to another unless they relate to the same subject and are enacted for the same purpose. 'It is not enough that there is a discrepancy between different parts of a system of legislation on the same general subject; there must be a conflict between different acts on the same specific subject.' When there is a difference in the whole purview of two statutes apparently relating to the same subject, the former is not repealed." Lewis's Sutherland, Stat. Constr. 2d ed. § 247. "An implied repeal on the ground of repugnancy will not result in any case unless both the object and the subject of the statutes are the same; and if their objects are different both statutes will stand, though both relate to the same subject, because in such case the conflict is apparent only, and when the language is restricted to its own object, the two will run in parallel lines without meeting." 26 Am. & Eng. Enc. Law, p. 727. "A subsequent statute which institutes new methods of proceeding does not, without negative words, repeal a former statute relative to procedure." Lewis's Sutherland, Stat. Constr. 2d ed. § 260. In such case the new remedy will be deemed cumulative. These rules are fundamental. They were dictated by common sense and have the support of all the authorities. They have received the sanction of wisdom and experience, and are so well defined and uniform that—as the Supreme Court of the United States has said—"on the abstract principles which govern courts in construing legislative acts, no difference of opinion can exist." United States v. Fisher, 2 Cranch, 358, 386, 2 L. ed. 304, 313; The Paulina v. United States, 7 Cranch, 52, 60, 3 L. ed. 266, 268; Cary v. Curtis, 3 How. 236, 239, 11 L. ed. 576, 578; Davis

v. Packard, 8 Pet. 312, 8 L. ed. 957. Difference of opinion can exist only in the application of the principles.

Clearly there is no irreconcilable conflict between chapter 53, Laws 1915, which authorizes the state examiner to appoint a receiver of an insolvent banking corporation, "with the approval of the state banking board," and the provisions of § 5146, Comp. Laws 1913, which authorizes the state banking board "to make such rules and regulations for the government of such (banking) corporations as in its judgment may seem wise and expedient;" and "to appoint by its own order, receivers for insolvent (banking) corporations." Section 5146 is the provision which created the state banking board and defined its powers. Chapter 53, Laws 1915, does not, by its terms or by necessary implication, purport to legislate with respect to the state banking board. There is no legitimate reason why chapter 53 and § 5146 cannot stand together in their entirety. And under the elementary rules of construction, above quoted, it is the duty of the court to so construe them. I fail to see how they can be construed otherwise. While the majority say that the legislative intent, evidenced by chapter 53, to take away from the state banking board the power to appoint receivers conferred by § 5146 and to vest such power in the state examiner, is so plain that "he who runs may read," it strikes me as more likely that one who believes he has seen such intent must have been running while reading,—and running so fast as to be unable to observe the plain and unmistakable signboards along the way which indicated the true legislative intent.

Reference is made in the principal majority opinion to the case of Youmans v. Hanna, 35 N. D. 479, 160 N. W. 705, 161 N. W. 797, Ann. Cas. 1917E, 263; and it is stated that the closing of the Youmans bank at Minot was in part responsible for the enactment of chapter 53. In other words, the inference is drawn that the legislature believed that some wrong had been done by the banking board in connection with the closing of that bank, and that to remedy the mischief shown to exist in the former law, the legislature decided to take away from the state banking board the power to appoint receivers for insolvent banks, and vest this power in the first instance in the state examiner.

Let us see what foundation there is for the inference drawn by the majority. The complaint of the plaintiff is set forth at the commencement of the opinion of Youmans v. Hanna. See 35 N. D. 481–488.

.A reading of that complaint will disclose that the plaintiff there claimed that the state examiner was the principal official offender. With respect to the closing of the bank, the complaint alleges: "On the following Monday, October 20, 1913, the plaintiff being unable to put the $48,000 of additional cash capital into said Savings Deposit Bank to satisfy the unlawful and fraudulent demands of said Severtson, pretending to act as chief examiner of North Dakota, the said Severtson and one of his deputies took actual physical possession of said bank and kept its doors closed; placing a sign on the front door, reading as follows: 'Bank closed: state examiner in charge.' *No steps were taken or contemplated by the chief examiner or the state banking board for the appointment of a temporary receiver of said bank."* 35 N. D. 486. While the complaint also alleged that the members of the state banking board had entered into the conspiracy with the state examiner and the other defendants, there was no pretense or attempt to show, by any evidence whatsoever in that case, that the state banking board had any other connection in the matter, except to act upon and carry out the recommendations of the state examiner. The evidence was undisputed that he was the only official on the ground. He was the only official who had any actual connection with the closing of the bank. In fact this was recognized even by Judge Robinson, who filed a very strenuous dissent. As Judge Robinson specifically pointed out in his opinion that "there was no sense or reason for making any other person a party to the action," except "those who were present aiding, abetting, or profiting by the wrecking." This language could only have reference to the members of the banking board, as all the other defendants were actually present and participated in the transactions connected with the closing of the bank, and the transfer thereof to the parties who took the same over. Hence, it is apparent that even Judge Robinson was of the opinion that there was no cause of action whatever established against the members of the banking board.

Of course, Youmans v. Hanna et al. had not been decided at the time chapter 53 was enacted. But, it is true, the legislative assembly which enacted chapter 53 was fully aware of the controversy which had arisen as a result of the closing of Youman's bank. Youmans had published a pamphlet, about the closing of the bank, entitled "Legalized Bank Robbery." On February 2, 1915, a resolution was introduced in

the house of representatives for the appointment of a legislative investigating committee, consisting of two representatives and one senator; "with full authority to examine the said publication, the files, records, and papers in the bank described in said publication, and the records and reports of the examiner's department relating to said bank, for the purpose of ascertaining the truth or falsity of the charges preferred, said committee to make a report of said examination to the legislative assembly, and, in order to make a full and complete report thereof, such committee is authorized to issue subpœnas and compel the attendance of witnesses, and to make findings and report the same to the legislature." The resolution stated that the charges preferred in the pamphlet were such "as will bring discredit upon the state and its public officials, and subject the examiner's department, *particularly,* to serious criticism." See House Journal 1913, p. 350.

On March 2, 1915, the investigation committee's report was submitted to and approved by the senate (Senate Journal, p. 877). It was submitted to the house of representatives on the same day. House Journal, p. 1459. The report was quite extended and completely exonerated the state examiner. The concluding paragraph in the report was as follows: "We think that the actual cash market value of the assets of the Savings Deposit Bank on October 20, 1913, were insufficient to pay its liabilities. And from the foregoing facts, our conclusions are that the examiner, S. G. Severtson, while acting under the authority from the state banking board, made a demand and order on the Savings Deposit Bank, with which there was a failure to comply, and that under all the circumstances, taking into consideration the reports of prior examinations of said bank, the methods used by Mr. Youmans in the management of the bank and the trust company, and the condition of the assets in October, 1913, that the examiner, S. G. Severtson, had a perfect right to take the steps which he did in protecting the depositors of the bank, and that he acted within the authority of the law in closing the bank October 20, 1913; and we will further say that Mr. S. G. Severtson is entitled to credit, rather than censure, for his acts in this matter." Chapter 53 was placed upon its final reading and final passage on the same day that the report was adopted by the senate. It was passed without a dissenting vote, and the senate member of the investigation committee voted for it. Senate

Journal, p. 915. The act received the approval of Governor Hanna, who was chairman of the state banking board at the time the Youmans bank was closed. These facts speak for themselves, and it is beyond my comprehension how anyone can draw the inference therefrom which the majority members say may be drawn.

Little can be added to what has been said by Judge Birdzell upon the question of the denial to the respondents of a trial according to the law of the land. In fact it should hardly be necessary to say anything at all on this subject, except to point out the facts,—that the only proofs received in this case consisted of *ex parte* affidavits; that the respondents were denied an opportunity to cross-examine a single person who made affidavit against them, or to produce and examine in court a single witness in their own behalf. For in this country, it is a fundamental rule, familiar not only to lawyers, but to every intelligent citizen, that every person proceeded against in a court is entitled to an opportunity to be heard, and to defend, in an orderly proceeding adapted to the nature of the case. In other words, in this country, the law must hear before it condemns, and proceed upon inquiry, and render judgment only after trial. 6 R. C. L. pp. 446, 447. In this case the judgment of this court as announced by the majority not only in effect finds the respondents guilty of wrongful official action, but for good measure pronounces "condemnation" and mulcts them for costs. This is done without affording them an opportunity to be confronted by their accusers or to cross-examine a single person who bore witness against them. It is done over their protest, and in denial of their specific request that they be afforded an opportunity to cross-examine such persons. The right of cross-examination is recognized as a valuable one. A denial thereof in an ordinary action is a denial of a substantial right guaranteed by the law of the land, which of itself will invalidate the judgment and require a new trial of the case. Only a short time ago every member who concurred in the majority opinion also concurred in another opinion whereby a judgment of the district court was reversed because they deemed that the cross-examination of a certain witness had been too restricted. See German-American State Bank v. Erickson, 41 N. D. 548, 170 N. W. 854. That case involved the ownership or right of possession of a horse. This case—so the majority say—involves questions of transcendent importance,—ques-

tious affecting the sovereignty of the state or its franchises or privileges, or the liberties of its citizens, and in this case cross-examination is not only restricted, but wholly denied.

Reference has been made by one of the majority members to the trial of Christ. Even upon that trial the right to be confronted by the accusers and witnesses was not denied. That is true both of the trial before the Jewish Sanhedrin and before Pilate. For it is written: "And the high priest stood up and said unto him, Answerest thou nothing? What is it which these witnesses say against thee?" Matt. 26:62. And Pilate said: "Behold, I have examined him before you, have found no fault in this man touching those things whereof ye accuse him." St. Luke, 23:14.

It has been suggested that the respondents might have taken their evidence by deposition. This of course ignores the fact that the respondents would still have been denied the right of cross-examination. It also ignores the fact that, by the express terms of our statute, depositions "may be used only in the following cases:

"1. When the witness does not reside in the county where the action or proceeding is pending, or is sent for trial by change of venue, or is absent therefrom.

"2. When from age, infirmity, or imprisonment the witness is unable to attend court or is dead.

"3. When the testimony is required upon a motion or in any other case when the oral examination of the witness is not required." Comp. Laws 1913, § 7889.

But respondents had no reason to suppose that it would be necessary for them to take depositions. For upon the argument, in response to questions propounded by members of the court, respondents' counsel stated specifically that the respondents would not consent to a submission of the case for final disposition upon affidavits. Request was then made by such counsel that, in event the court assumed jurisdiction, opportunity be afforded for the oral examination of witnesses, and reference was made to specific persons who had made affidavits for the relators, and to particular facts in such affidavits upon which cross-examination was deemed essential. At that time it was not intimated by the court, or a single member thereof, that the parties ought to proceed to take depositions. The first notice the respondents had that they

would be denied an opportunity to examine witnesses in their own behalf, and cross-examine witnesses for the adverse parties, was when the decision as promulgated by the majority was handed down.

It has been suggested that the exigencies of the case required an immediate disposition, and that it would have occasioned too much delay to send the case to the district court for trial of the issues of fact. Of course, the mere fact that it might have taken longer time would not justify a denial to the respondents of a proper trial. The same reason might be advanced in a majority of, if not in, all important cases. There is generally need of speedy determination. There was, however, no reason why oral examination of witnesses should have delayed determination of the case. The argument was had on October 15th. The parties were subsequently, without request from either side, given until October 23d in which to submit additional affidavits. If the court had desired, and had so ordered, the trial could have commenced on the 16th of October. Surely if the court could deny all right to examine witnesses, it could have limited the time allowed for such examination, and required that the result be certified to the court by a specified date, —say October 23d. This would have given several days for an orderly trial. But the court was not required to send the case to the district court. There was nothing to prevent this court itself from hearing oral evidence. The law allows it. It was done by this court in Re Sidle, 31 N. D. 405, 154 N. W. 277. That was a habeas corpus case, involving the custody of a child. The court as then constituted deemed it improper to determine the disputed questions of fact there involved without affording the parties opportunity to examine witnesses orally.

I agree with Judge Birdzell that the question of the solvency or insolvency of the relator bank is in no event before the court. I cannot conceive of that being a question "affecting the sovereignty of the state or its franchises or prerogatives." The question of the solvency or insolvency of said bank was, however, directly involved in the action which the attorney general had instituted in the district court of Cass county prior to the commencement of this proceeding. The record shows that the attorney general applied to the district court for and obtained leave to bring such action. It also shows that the summons and complaint, application for appointment of receiver, and order to show cause therein, were served upon the president of the relator bank

on October 6, 1919. The application for the appointment of receiver was set for hearing on October 13, 1919. That action was concededly one within the constitutional jurisdiction of the district court. It must be assumed that the district court would have decided correctly the questions involved in that action. There was no justification for this court interfering with the orderly disposition of that cause. Manifestly there could have been no such intention at the time the alternative writ was issued; for in the petition of the relators in this case it was alleged "that no action or proceedings have yet been started against said bank by the state banking board; and relators have no speedy and adequate remedy at law."

It may also be noted that the statute creating the state banking board, and defining its powers, provides a specific remedy for a party aggrieved by any order of the banking board, *viz.,*—an action in a court of competent jurisdiction for modification or annulment of such order. See § 5146, subd. 3, Comp. Laws 1913.

While I do not deem the question of solvency or insolvency here, and would in no event attempt to determine it without a trial and legal evidence upon which to base my conclusion, it is only fair to the members of the banking board to point out that their action was taken upon a very extended report signed by two deputy state examiners and an assistant attorney general, wherein the examiners stated as their opinion that the bank was "hopelessly insolvent." One of the examiners is a man of large experience, and has served many years in the state examiner's department in his present capacity. The report shows, among other things, that the bank has $50,000 capital, and $10,000 surplus; that its loans and discounts aggregate $1,203,486.06; that more than $725,000 of such loans are excessive, *i. e.,* made in amounts in excess of what the law allows a bank to loan to any one borrower; that (exclusive of such excessive loans) over $46,000 are "bad debts" (the directors have subsequently charged off the bank books $25,000 of these loans, and paid over cash to the bank therefor); that more than $169,000 of the loans and discounts consist of past-due paper, and that over $104,000 of such past-due paper in in the hands of attorneys for collection; that over $26,000 of the loans have been made to officers of the bank, and that one of the excessive loans has been made to its president; that the legal reserve of the bank is more than $400,000,

and the cash reserve is more than $70,000, below the statutory requirement.

With all due deference to the views of the majority members, I believe that the practice which they have adopted and sanctioned in this case is contrary to the letter and spirit of our law; and that their decision is erroneous in its entirety. As it is without precedent in judicial annals, so do I hope it will not become a rule to be followed in future determinations.

BIRDZELL, J., concurs.

Addendum filed November 25, 1919.

BRONSON, J. The dissenting opinion of Justice Birdzell was circulated on October 31, 1919, seven days after the decision of this court, and the final determination of this case. The dissenting opinion of Justice Christianson has this day, November 22, 1919, been circulated.

In discussing the powers and the jurisdiction of this court, Justice Birdzell has brought into his opinion, as a basis for some of his reasoning, *ex parte* applications made by the attorney general, after this court assumed original jurisdiction. It has heretofore been considered not necessary, in determining the questions in this case, to make mention of these applications; they now, however, will be mentioned and discussed. After this court issued its original order restraining the defendants from exercising unlawful and arbitrary power, as alleged in the petition, and as found, the attorney general made an application (October 8, 1919) to retain certain papers that had been seized by him and his assistants, upon the ground that they desire to use the same in certain criminal proceedings then pending. This application ·was promptly denied; it was evidently an attempt to embarass this court in the consideration of this case. The attorney general had, and still has, full opportunity, as he well should know, to secure such evidence as otherwise fully provided for by law. The attorney general then applied (October 11, 1919) for permission, in effect, to proceed with the action in the district court, again evidencing an attempt to embarrass this court in its consideration, knowing full well that the action in the district court was based entirely upon the proceedings taken by him and the banking board. This application was denied. Upon oral argument the respondents, through the attorney general (October 15,

1919) again sought delay by seeking the remand to the district court, for purposes of taking testimony. This again was evidently, on its face, an attempt to secure delay.

There was then presented and submitted to this court legal questions of the statutory power of the respondents, unquestioned, uncontroverted, and concerning which no further evidence was necessary; namely, the statutory authority of the respondents under the specific statute upon which they relied to do the acts questioned. This application, therefore, could serve only to delay the determination of this question of power, and thereby perhaps, through delay, render effective the action taken by the respondents, even though without power and arbitrary. Mere delay in itself, under the circumstances of the case, would be as effective in destroying the relator bank, and the powers of the state examiner in regard thereto, as perhaps the actions as taken by the respondents. This court, instead of providing for sending this case back to the district court to take oral testimony, on the same day (October 15, 1919), of its own order, granted to the respondents eight full days to submit any other records or evidence before this court; not a scrap of paper of any kind was filed by the respondents to show any facts of any kind or character, which would even offer or give any indication to this court that they possessed any other evidence or could secure any other evidence than that which was submitted by them upon the oral argument. On October 21, 1919, two days before the expiration of the time when the respondents could file or submit additional evidence, another application by the respondents was made, in effect, asking for further delay and permission to take certain testimony of some witnesses whom they asserted were unwilling to testify. Such application mentioned neither the witnesses nor the nature of the testimony sought to be secured. They sought to take oral testimony before some court; the application was principally grounded upon the statement that they desired to use this testimony, so to be secured, in certain other criminal proceedings pending. This application was not granted. The dissenting members of this court knew of all these acts and proceedings by the attorney general; no motion was made by them or action taken seeking to secure further additional oral testimony in this case. This court well understood and perceived the evident attempt being made to delay the determination of this cause, and to use this court as an adjunct

improperly, in connection with certain criminal proceedings pending in a district court.

In the dissenting opinion of Justice Birdzell, an attempt is made to build up an argument that this proceeding did not conform to the law, for the reason that the respondents were not accorded an opportunity to take or submit oral testimony, with the right of cross-examination. The dissenting opinion of Justice Christianson likewise so contends. This argument, upon the real facts of this case, is supported neither upon principal nor authority. It is, in my opinion, merely an attempt to justify the arbitrary action and the proceedings of delay evidenced in this record, from beginning to end, on the part of the respondents. Well do the dissenting members of this court recognize and know that no oral testimony of any kind upon this record was necessary so far as the question was involved of the statutory power of the respondents to take the action that they did. The respondents asserted the right to act under a specific statute; they claimed no power otherwise. This statute, by this court, was determined to be repealed. This left the respondents without power.

Upon this construction alone, this case was determined against the respondents as far as the issuance of the writ herein is concerned. The dissenting opinions, therefore, with reference to the question of oral testimony and the right of cross-examination, affect only that portion of the majority opinion which, assuming for purposes of argument that the respondents did possess the statutory power for which they contended, characterizes and determines the acts of the respondents so taken as arbitrary and illegal.

In this regard, however, the respondents in this case, *had full opportunity to take evidence, and full opportunity to orally examine and orally cross-examine* all witnesses that they might have desired to produce.

Under the statute of this state there are three methods of taking the testimony of a witness: (1) By affidavit; (2) by deposition; (3) by oral examination. Comp. Laws 1913, § 7883.

After this case was at issue, and even before the oral argument of this cause, the respondents had full opportunity and full right to take any evidence desired by depositions, before any judge or clerk of the

46 N. D.—34.

supreme court, or district court, or before other officers, including notaries public. Comp. Laws 1913, § 7891. These could have been taken upon commission or notice. Comp. Laws 1913, §§ 7894 and 7895. In the taking of such depositions all of the rights of examination and cross-examination would accrue to the respondents the same as if before any court. These depositions could have béen commenced at any time after the appearance of the defendant in the action. Comp. Laws 1913, § 7890. These rights the respondents had continually until October 23, 1919. The depositions, if so taken, could have been used before this court; they could have been admitted; not only by statute, but under the power of this court. Comp. Laws 1913, § 7889. The very citations, to wit, § 7889, Comp. Laws 1913, quoted by Judge Christianson, show the authority of this court to receive a deposition in such a proceeding.

The respondents did not choose to even make offer to take evidence by deposition. They did not even offer to produce before this court a single witness; they did not even submit, after October 15th, one single additional affidavit. They sought, apparently, the only course considered available to them, under the circumstances; namely, delay, and a demand for remanding this case to a district court for trial, for the taking of testimony which could as well be accomplished by statutory methods already existing for them.

It is therefore evident how groundless the contentions are that no opportunity was granted to the respondents to take evidence, to examine and cross-examine witnesses orally.

Chief Justice Christianson speaks of issuing a writ of preliminary order in this cause without notice to the respondents. It is illuminating, indeed, concerning this argument, to view the acts of Justice Christianson himself in many cases within recent years where he himself has caused or countenanced the exercise of the original jurisdiction of this court, without notice to other respondents who were present in the Capitol building where this court sits.

Concerning the question of original jurisdiction of this court the facts in the record speak sufficiently for themselves. Justice Birdzell, however, would have this court determine only one small question involved in the exercise of such original jurisdiction,—the question of the power of the banking board and of the state examiner,—and leave

the other questions for the prolonged consideration of other courts to be finally determined by this court in the exercise of its appellate jurisdiction; that is to say, determine the prerogatives of the state, and then, after making such determination in words, set the parties adrift; and, if perchance these prerogatives of the state are jeopardized and made ineffective through delay both as state institutions and as private institutions, then finally answer that the parties nevertheless have had their day in court; the law finally has prevailed, and the relators finally have received a paper decision through judiciary process, even though, long since the subject-matter involved had been determined alone by the elements of time.

The answer to this sort of argument is the old, well-worn maxim oft repeated and frequently made the basis of complaint concerning judiciary action; namely, "that justice delayed is justice denied."

The chief justice maintains that chapter 53, Laws 1915, which gave specifically to the state examiner power to appoint a receiver with the approval of the state banking board, did not repeal the power theretofore possessed by the state banking board alone to appoint a receiver without the initiative action or consent of the state examiner. He argues and contends, through a lengthy discussion, that the well-known case of Youmans v. Hanna affords no inferences such as are drawn by the majority opinion; he refers to the complaint in the Youmans v. Hanna actions; he refers to the action of the senate in the Youmans Bank investigation; he refers to the resolution adopted by the senate, finding in favor of the authority exercised by the state examiner and his actions as taken. The chief justice was not a member of the senate at the time these proceedings took place; the writer of the majority opinion was. Many things and occurrences took place in the senate beyond and in addition to the allegations contained in the complaint before the court; it serves no useful purpose to discuss them at length. The best answer, however, to the entire situation is the suggestion, "Why was chapter 53, Laws 1915, *enacted* giving the *specific power* to the state examiner with the approval of the state banking board, if everything in connection with the Youman Bank matter and the activities of the state banking board were considered proper, correctly carried on, and entirely supported by existing statutory provisions?"

The justification for this addendum opinion lies in the importance

of this cause, its far-reaching results, and in the definite understanding that the judiciary in this state should administer justice not only impartially, but with prompt despatch.

Two courses were open before this court, one which, through the delay of the respondents or through its arbitrary and illegal power, pointed out a way of wreck and ruin concerning the credit of this state, financial institutions, and the safety and trust of depositors in state banking institutions. The other way lead to the prompt consideration and the prompt despatch of the issues before this court, and to a conclusion which determined promptly that the powers exercised by the respondents were not possessed by law, and, even though assumed to be possessed, were arbitrarily and illegally exercised.

Through the prompt action and consideration given this cause by this court, through its majority members, there has been no jeopardizing of state finances; the powers of the state examiner have been made effective, without injury or destruction to any institutions or parties; the rights of the relators have been preserved and depositors protected. The relator's bank, and banks similarly connected, to-day are going institutions, recognized by the public as solvent, and receiving the confidence of the public in deposits and in business, greater than ever before. Both upon principles of law and justice the exercise of the original jurisdiction of this court to its full extent has been fully justified.

No lengthy arguments, through abstruse reasoning, or upon legal technicalities concerning due process of law, or upon grounds of narrow construction or deduction, can wipe away or eliminate the bold, clear, and undisputed facts submitted on the record in this case, which require the necessity of action. The principles of law involved herein have become matters of contention more through the great public interests and the great public importance involved in this case.

In ordinary cases, time and again, this court has exercised original jurisdiction involving questions of fact, and no difficulty has been met in determining a method for solving such questions of fact. Freely has original jurisdiction in this court been exercised in this state, and very freely indeed have the dissenting members of this court been parties in securing and upholding the exercise of this original jurisdiction for the purpose not only of determining matters admitted upon the

pleadings, but asserting the power and the right to determine issues of fact as an inherent power of this court.

BRONSON, J. Justice Birdzell has circulated (November 26, 1919) still another dissenting opinion, deeming it necessary, apparently, to add to the already long opinion heretofore prepared by him. Soon we may expect a daily addition of dissenting opinion; soon we may look for a personally conducted debating school among the members of this court. Although this court has long since entered judgment in this matter, nevertheless Justice Birdzell takes the strange position of treating and stating such judgment to be void, even though rendered by the court of which he is a member. It is peculiar, indeed, that the dissenting members of this court, when conference was had at the time this case was determined, should offer no suggestions, should quietly sit by, mum as oysters, and, when asked by a majority member of this court whether they had anything to say, should simply reply by the statement that they dissented and reserved the right to file a dissenting opinion. The whole tenor of the argument contained in the late opinion of Justice Birdzell is one that speaks for delay, and concerns alone questions of practice in cases of original jurisdiction before this court.

One indeed would be constrained to believe, from the argument contained in such opinions, that this case was up for trial before a lower court. When this case was up for consideration before this court all of the issues there presented were for the consideration of this court, not for the consideration of the trial court or any other court. The case was presented to this court upon a petition like a complaint, and upon a return and answer; the issues were framed; the cause was pending; the merits were then here. Upon these merits the parties did submit evidence; well did the respondents realize the necessity of prompt action if the *status quo* of the relators' rights was to be preserved; they had ample opportunity to furnish or submit additional evidence if they so desired. The respondents sought delay, realizing, perhaps, that, if they were without the power in the statute cited by them, the delay which might be occasioned would be fully as effective as if they had the power. The dissenting members of this court have now stepped into the shoes of the respondents, and are attacking the jurisdiction exercised and the prompt decision rendered in this case, by ar-

guing and contending that proceedings of delay should have been afforded. This case was set for hearing and determination on October 15, 1919, all of which the parties and the court well knew. It has never been set for hearing and determination on any other day. The reasoning in Justice Birdzell's opinion is indeed illuminating, which suggests, and even contends, that the parties did not know before what court they were to produce their witnesses.

Upon his present dissent, he is forced into the position of contending for proceedings of delay in a trial or district court to take additional evidence in a case of original jurisdiction before this court, even though the determination of this court, that the respondents possessed no statutory power to appoint a receiver without the initiative act or consent of the state examiner, settled this cause, and obviated the further necessity of taking any additional testimony in any event.

To bolster up their contentions for the taking of testimony before a trial court, and for delay, did they desire an accounting to be taken of every note and obligation of the relator bank, through a long course of accounting in a trial court.

In this cause the determination of the respondents' lack of power, upon the conceded facts, determines the case against them. In addition, the action of the respondents upon report, inaccurate, false as to the records investigated, and erroneous as to the law applicable, was determined to be arbitrary and unjust. Time was for some court when mere rhetoric and logic based upon an assumed premise sufficed, through the law's delay and legal technicalities, to defeat justice, no matter how clear the case might otherwise appear; the complaint of the American public, long and persistent has been heard by the bench and the bar of this country; the argument of the dissenting members is the old constitutional argument that the "i's" must be dotted; that the "the" in front of the word "state" must be stated in an indictment to protect the constitutional rights of the accused. Constitutions were established to protect, not to destroy, people's rights. In straining over a constitutional argument, the dissenters fail to observe this.

Again, it is well, in discussing fundamental questions of jurisdiction, to refer to the constitutional provision (N. D. Const. § 87) which states that the supreme court shall have power to issue writs of injunction and such other original and remedial writs as may be necessary to

the exercise of jurisdiction and shall have authority to hear and determine the same. Likewise, to § 7340, Comp. Laws 1913, which provides that the supreme court shall always be open for the issue and return of all writs and process which it may lawfully issue, and for the hearing and determination of the same, subject to such regulations and conditions as the court may prescribe. December 6, 1919.

Justice Birdzell has circulated December 5, 1919, a revised copy of the dissenting opinion of November 26, 1919. It needs no further discussion other than stated in the above opinion.